### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TABRIA MONTGOMERY,** | : | |
| **Individually and as Administratrix** | : | |
| **of the ESTATE OF MICHAEL** | : | **CIVIL ACTION** |
| **MONTGOMERY, deceased,** | : | **No. 24-367** |
| *Plaintiff*, | : | |
| **v.** | : | |
| | : | |
| **BOBST MEX SA,** *et al.*, | : | |
| *Defendant*. | : | |

### MEMORANDUM

**HON. JOSÉ RAÚL ARTEAGA**                                      **April 22, 2026**
**United States Magistrate Judge[1]**

Plaintiff Tabria Montgomery's father, Michael Montgomery,[2] sustained fatal

injuries while operating a Bobst Mastercut 145 PER 2.0 Die-Cutter machine bearing Serial

No. BSA05662000208/1951 ("Mastercut").  (ECF 48 at ECF p. 5; *see also* ECF 58-1 ¶ 4.)  She

asserts claims individually on behalf of herself and her father's estate against Defendant

Bobst Group North America, Inc. ("Bobst NA"),[3] for strict products liability, negligence,

wrongful death, and survival and against Defendant Graphic Packaging International,

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge
to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C.
§ 636(c).  (*See* ECF 25.)

[2] For clarity, this Opinion refers to Tabria Montgomery as Plaintiff and to Michael
Montgomery as Mr. Montgomery.

[3] Although Plaintiff directs her claims against Bobst Group North America, Inc., it
contends its "correct corporate name is Bobst North America, Inc." (ECF 17 ¶ 9; *see also*
ECF 66-2 at ECF p. 1 ("Defendant Bobst North America, Inc., formerly Bobst Group North
America, Inc.").)  The Court uses that name for purposes of this Opinion.

LLC ("GPI"), for negligence, wrongful death, and survival. (*See* ECF 1-1 at ECF p. 7-36.) Bobst and GPI assert crossclaims against each other seeking contribution and/or indemnification. (*See* ECF 29; ECF 44.)

Among several motions now pending before the Court is Bobst NA's Motion to Exclude the Expert Testimony of Brian O'Donel, P.E. (ECF 63.) Mr. O'Donel, Plaintiff's design and liability expert, opines that the Mastercut was defectively designed because it lacked appropriate and necessary guarding in the form of light curtains and interlocked guards. (*See* ECF 63-3 at ECF p. 13-17, 35-38 (Ex. A., Expert Report of B. O'Donel at 12-16, 34-37).) He also concludes that the Mastercut malfunctioned based on his analysis of the evidence of record. (*Id.* at ECF p. 10-11, 37.) Bobst NA argues that Mr. O'Donel's opinions should be excluded because his methodology is unreliable and will not assist the trier of fact. (ECF 63-1 at 7-15.) Plaintiff responds that Mr. O'Donel's opinions are reliable because they are properly based on his expertise and review of the record, and the proposed safety features were already used elsewhere on the Mastercut. (ECF 70 at ECF p. 17-25.) Plaintiff also argues that Mr. O'Donel's opinion that the Mastercut malfunctioned is relevant because Mr. Montgomery would not have been crushed without the malfunction. (*Id.* at ECF p. 25-26.)

Upon review of the record and the parties' arguments, Bobst NA's Motion is granted in only part: Mr. O'Donel's opinion that the Mastercut malfunctioned is unreliable and, thus, inadmissible. In all other respects, Bobst NA's Motion is denied.

## I.   BACKGROUND

The Mastercut that Bobst NA sold to GPI takes pallets of cardboard blanks and cuts and processes them into food packaging. (ECF 66-2 ¶¶ 1-2.) In the machine's delivery section, a delivery plate holding a pallet receives finished cardboard product and lowers in a controlled manner as the pallet loads. (*Id.* ¶ 3; *see* ECF 66-5 at ECF p. 1013-14.) A delivery door restricts access to the delivery area beneath the delivery plate during pallet loading, and a safety device called a light curtain[4] covers the gap between the door and the floor of the facility and stops machine motion when breached.  (ECF 66-2 ¶ 4.)  When the delivery tray is fully loaded with a pallet of product, it lowers onto the conveyor, the delivery door opens, and the pallet is transported out the delivery area. (*Id.* ¶ 5.)

The Mastercut was designed and manufactured with safety features, including light curtains, movable interlocked guards which prevent machine motion when opened, and emergency stop switches at select locations. (*Id.* ¶ 8.) The Mastercut has a raised operator platform where GPI's die cutter operators stand while working. (*See id.* ¶¶ 12; ECF 66-5 at ECF p. 977.) A side panel of the operator platform equipped with fixed guards ("the panel") separates the interior of the Mastercut from its exterior. (*See* ECF 66-2 ¶¶ 9-10.)  GPI employees removed the panel at some point to gain access to the underside of the operator platform.  (*Id.* ¶12; ECF 66-5 at ECF p. 1015.)

---

[4] Light curtains emit infrared beams that create a visible barrier which protects workers from hazardous machinery.  Light curtains typically send a signal for a machine to stop running when the light barrier is penetrated. (*See* ECF 66-5 at ECF p. 173.) *See Martinez v. Triad Controls, Inc.*, 593 F. Supp. 2d 741, 748 (E.D. Pa. 2009).

Mr. Montgomery was employed by GPI and was working as a die cutter operator on the Mastercut on February 6, 2022 at GPI's Phoenixville, Pennsylvania location. (ECF 66-2 ¶¶ 24-25; ECF 1-1 at ECF p. 12.) Surveillance video recorded during his shift shows that the panel was removed and leaning against the Mastercut, leaving an opening under the operator platform. (ECF 66-2 ¶ 26.) Mr. Montgomery passed through the opening at 2:52 p.m. without first pressing an emergency stop button or locking out the machine to power it down. (*Id.* ¶¶ 27-29.) He was found dead about one and a half hours later under a loaded pallet in the delivery area. (*Id.* ¶¶ 30-32.) His cause of death was traumatic asphyxiation. (*Id.* ¶ 32.)

In the expert report he prepared for Plaintiff, Mr. O'Donel opines that the Mastercut was defectively designed because a light curtain should have been installed at the interior-side access point to the delivery area. (*See* ECF 63-3 at ECF p. 13-14.) He also asserts that the operator platform panel should have been equipped with interlocked guards or a light curtain. (*Id.*) Separately, he opines that the evidence of record shows that the interlocked delivery door was open when Mr. Montgomery entered the delivery area. (*Id.* at ECF p. 10-11, 37.) Accordingly, he contends that the Mastercut malfunctioned by allowing the delivery tray to descend and crush Mr. Montgomery because it should not have been able to move. (*Id.*)

## II.    LEGAL STANDARD

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596

(1993); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017).  Consistent with this, "[t]he [Federal] Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). So, "Rule 702, which governs the admissibility of expert witness testimony, has a liberal policy of admissibility." *Id.*

A witness qualified to provide expert testimony is permitted to give testimony that would otherwise be impermissible, if the proponent of the qualified expert shows by a preponderance of the evidence that (1) "the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.  "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

To be reliable, an "expert does not have to be right." *United States v. Anderson*, 171 F.4th 232, 235 (3d Cir. 2026). Reliability is a "lower" bar "than the merits standard of correctness." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999).  A reliable opinion need not have "the best foundation" or even be "supported by the best methodology or unassailable research."  *Karlo*, 849 F.3d at 81.  It cannot, however, be based "on subjective belief and unsupported speculation." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833-34 (3d Cir. 2020). "Determining reliability is not a check-the-box

exercise," and the Court has "significant autonomy to do the necessary work." *Anderson*, 171 F.4th at 236. Factors to consider include "testability, peer review, error rates, existence of standards, and general acceptance of the method." *Id.* Courts may also weigh the relationship of an expert's technique used to methods that have previously been established to be reliable and "the non-judicial uses to which the method has been put." *Cohen v. Cohen*, 125 F.4th 454 (3d Cir. 2025).

An expert's opinion "fits" when it is more likely than not that it will help the trier of fact with respect to the questions in the case at hand, a question that "goes primarily to relevance." *Daubert*, 509 U.S. at 591.

## III.   DISCUSSION

Bobst NA contends that while Mr. O'Donel qualifies as an expert, his methodology is unreliable and would not be helpful to the trier of fact, so his opinion should be excluded pursuant to Rule 702. (ECF 63-1 at 4.) Bobst NA challenges Mr. O'Donel's opinions about the panel's guard design, whether additional light curtains should have been in place, and whether the Mastercut malfunctioned. (*Id.* at 8-15.) Bobst NA's arguments are addressed in turn.

### A.   Reliability

#### 1.   Interlocked Guard

Bobst NA argues that Mr. O'Donel should be precluded from offering his opinion that the panel should have had an interlocked guard because he did not examine the

Mastercut,[5] conduct any testing, or perform a risk assessment for his analysis. (ECF 63-1 at 8-9.) Bobst NA faults him for failing to provide drawings, models, or calculations showing any proposed interlock's type, location on the Mastercut, manner of operation, and feasibility of installation.  (*Id.* at 9; ECF 84 at 2-3.)[6]

Plaintiff responds that Mr. O'Donel's interlocked guard opinion is properly based on his review of the evidence, relevant industry standards, and his specialized education, training and expertise.  (ECF 70 at 11, 19-20.)  She contends that this is not a case involving "novel scientific evidence" which requires peer review studies and quantitative testing,

---

[5] Plaintiff argues that "any argument that Mr. O'Donel's opinions are unreliable due to not inspecting the" Mastercut "should be rejected" because "Plaintiff attempted to coordinate an inspection" of the machine, but GPI objected and the Court did not permit one to occur. (ECF 70 at ECF p. 10 n.2.) In a response to a separate motion, Bobst NA admits that GPI objected to an additional inspection and the parties raised the issue in their Joint Rule 26(f) Status Report (*see* ECF 51), but Bobst NA argues that Plaintiff should have filed a motion to compel an inspection. (ECF 126 at ECF p. 4.) This issue is not dispositive of the instant Motion.  Mr. O'Donel testified that he was able to arrive at his conclusions without inspecting the Mastercut and that his document review — including photographs, past inspections, and surveillance — was similarly probative. (*See* ECF 66-5 at ECF p. 794-95.)  "An expert may base on opinion on facts or data in the case that the expert has been made aware of *or* personally observed." Fed. R. Evid. 703 (emphasis added).

[6] Bobst NA also takes issue with Mr. O'Donel's conclusion that its employees knew that GPI staff were frequently removing the panel and argues that the appropriate type of guard to use is dependent on frequency of access to the area. (ECF 63-1 at 6, 9.)  Plaintiff correctly notes that Brian Ewart, Bobst NA's corporate designee, testified that Bobst NA was aware that its customers might remove the panel to access the Mastercut's interior. (ECF 70 at ECF p. 7-8; ECF 66-5 at ECF p. 515.)  Ewart also testified that Bobst understood that such access would "need to happen from time to time for various reasons." (ECF 66-5 at ECF p. 515-16.) The parties' dispute over the frequency of access and, accordingly, the proper guard to use on the panel is an appropriate topic for cross-examination and presentation of contrary evidence. *See Daubert*, 509 U.S. at 596.

so Mr. O'Donel's opinion is not inadmissible because it fails to rely on such evidence. (*Id.*) Rather, she argues that Mr. O'Donel may properly opine that it was feasible to install an interlocked guard on the fixed panel because Bobst NA already used one in a different section of the machine.  (*See id.* at ECF p. 22-23; ECF 63-3 at ECF p. 21, 35.)

Bobst NA cites *Rossano v. Maxon*, 659 F. Supp. 3d 559 (E.D. Pa. 2023) and similar cases in support of its argument that Mr. O'Donel should be precluded from discussing alternative guard designs because he did not perform testing.[7]  Bobst NA is correct that "[c]ourts generally look for alternative design experts to provide evidence of calculations, diagrams, or tests to support their opinions." *Id.* at 570.  Such testing is often appropriate because "alternative designs based on engineering principles . . . rely on established principles of physics, material sciences, and industrial design and often utilize technologically sophisticated and carefully calibrated testing methods and devices." *Id.* at 568 (citation modified). However, lack of testing does not render an alternative design opinion unreliable *per se*. *See Elgert v. Siemens Indus. Inc.*, No. 17-1985, 2019 WL 1294819, at *5-6 (E.D. Pa. Mar. 20, 2019) (finding an expert's opinion reliable where it was based

---

[7] Plaintiff argues that Bobst NA's citation to several "crashworthiness cases" (*see* ECF 63-1 at 8, 11) are inapposite because they utilize a four-part standard requiring proof that an "alternative, safer design that was practical existed." (ECF 70 at ECF p. 18 (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000)).  Plaintiff notes that she need only show that the Mastercut was sold in a defective condition and the defect was the proximate cause of Mr. Montgomery's death. (ECF 70 at ECF p. 19.) *See Walton v. Avco Corp.*, 610 A.3d 454, 458-59 (Pa. 1992).  In its Reply, Bobst NA mostly confines its argument to *Rossano* and other products liability cases discussing alternative designs outside the vehicle context.  (*See* ECF 84 at 2-4.) The Court considers Bobst NA's arguments under Pennsylvania's general design defect framework.

on his "practical experience" as an engineer and his review of the record despite him not citing peer-reviewed literature or generally accepted practices); *see also Ahner v. Black Bros. Co.*, No. 06-1523, 2008 WL 2880382, at *2 (W.D. Pa. May 11, 2008) ("[W]e will not exclude Dr. Knott's proffered expert testimony as inherently unreliable because he did not identify or test actual alternative designs for the machine.").

Mr. O'Donel's opinion on alternative designs is reliable and may be offered to a jury. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.2d 717, 744-45 (3d Cir. 1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect."). He relies on his significant knowledge, experience,[8] and review of the record, including deposition testimony, interview transcripts, a 3D scan and electrical schematics of the Mastercut, photographs, operating and safety manuals, and documents provided by Bobst pertaining to the design of the Mastercut. (*See* ECF 63-3 at ECF p. 3-5; ECF 66-5 at ECF p. 794-95.)  Mr. O'Donel testified that his investigation required reviewing evidence, deriving a hypothesis, testing the hypothesis, and reaching a conclusion—in essence, applying the scientific method—and that he was able to render an opinion without inspecting or testing the Mastercut.  (ECF 66-5 at ECF p. 794-95.)  He relied on numerous industry standards concerning machine safeguarding (*see* ECF 63-3 at ECF p. 17-33) and

---

[8] Mr. O'Donel states that he is a licensed mechanical engineer with thirty years of experience in "industrial and machine safety including machine guarding" and twenty years of experience "in the printing and paper converting industry including presses, die cutters and box cutting machinery." (ECF 63-3 at ECF p. 3.) He also states that he has been accepted as an expert witness in machine safety before. (*Id.*)

determined that adding an interlocked guard on the panel was feasible based on Bobst NA's use of one elsewhere on the Mastercut.  (*Id.* at ECF p. 17.)

Accordingly, Mr. O'Donel opines that Bobst NA's failure to provide a safe alternative of an interlocked guard on the panel *as it had already done elsewhere on the Mastercut* was a failure to properly safeguard the pinch point crush hazard in the delivery area. (ECF 63-3 at ECF p. 13, 17.) *See McPeak v. Direct Outdoor Prods., LLC*, No. 19-3719, 2022 WL 4369966, at *5 (E.D. Pa. Sept. 20, 2022) (allowing an expert to opine that a "potential feasible solution" to a design defect would have been to cover cables in anti-corrosive sheathing which permitted periodic inspection despite the expert not testing whether this design was feasible); *English v. Crown Equip. Corp.*, No. 13-978, 2016 WL 614680, at *10 (M.D. Pa. Feb. 16, 2016) (finding that an expert's failure to conduct tests went "to the weight of his opinion and not to its reliability" where he "explained the rationale for his alternative designs").  Mr. O'Donel's assertion that an interlocked guard on the panel was practicable based on Bobst NA's use of such a guard in the delivery area is akin to a claim that his proposed alternative design was feasible because machines similar to the Mastercut also employed it.  *See Bloom v. Med. Depot, Inc.*, No. 24-1783, 2025 WL 2803913, at *11 (E.D. Pa. Sept. 30, 2025) (finding an expert's opinion about alternative designs reliable where, based on her "significant educational and practical experience," she concluded that the manufacturer could have used a design feature found in another product); *cf. Rossano*, 659 F. Supp. 3d at 570 (excluding an expert's opinion where he did not perform testing; provide mathematical equations, drawings, diagrams, or models; or "identif[y] *similar products to his alternative designs*" (emphasis added)).

10

Consequently, Mr. O'Donel's failure to test whether an interlocked panel would have prevented the accident or to provide drawings or mock-ups of his alternative design goes to the weight of his opinion and not its admissibility. His design defect opinion about the interlocked guard will not be excluded. Bobst NA may challenge it through the presentation of contrary evidence and testimony and, of course, on cross-examination at trial.

### 2.    Light Curtain

Bobst NA also argues that Mr. O'Donel's opinion that an additional light curtain should have been installed on the panel or in the Mastercut's interior is unsupported and unreliable. (ECF 63-1 at 11.)  It again notes that Mr. O'Donel did not (1) test his hypothesis, (2) perform a feasibility analysis, (3) provide drawings, models or calculations, or (4) show that his methods have been subject to peer review, have a known rate of error, or were generally accepted in the engineering community. (*Id.* at 11-12.) Bobst NA specifically faults Mr. O'Donel for not identifying his proposed light curtain's size, where it would be installed, or its "muting or sensitivity settings to account for falling scrap or other moving objects under the platform." (*Id.* at 12.)

Once again, Plaintiff argues that no testing was necessary for Mr. O'Donel's opinion to be admissible because Bobst NA already used light curtain technology on another part of the Mastercut. (ECF 70 at ECF p. 20.) She notes that based on his review of the record and his experience, which included "testing light curtains in similar environments," Mr. O'Donel testified that his alternative design was available, feasible, and engineer-tested and validated. (*Id.* at ECF p. 20-22.) She contends that Mr. O'Donel

specifically testified to the proposed light curtain's proposed size, location, and sensitivity settings. (*Id.* at ECF p. 22.)

Mr. O'Donel's opinion as to the light curtain is sufficiently reliable to go before the jury. At his deposition, he testified that he did not need to further evaluate his alternate design because light curtains are validated and tested in the engineering community. (ECF 66-5 at ECF p. 806.) He continued that the proposed light curtain would be "the *same type* of light curtain" as was already present at the delivery area and that one within the Mastercut would preferably encompass the open space "above the pallet and below the platform." (*Id.* at ECF p. 806-07 (emphasis added).) Mr. O'Donel testified that a light curtain on the Mastercut's interior could "function well" without "repeated interruptions due to scrap paper falling in its path" by calibrating its sensitivity. (*Id.* at ECF p. 805-06.) Mr. O'Donel based his opinion on his experience using light curtains in paper-converting plants and having previously tested a light curtain "in an environment that was similar to the operating conditions of a Mastercut." (*Id.*) He also considered the deposition testimony of Brian Ewart, Bobst NA's corporate designee, that Bobst NA could install a light curtain anywhere on the Mastercut that it deemed appropriate (*id.* at ECF p. 509) and reviewed engineering standards such as the safety hierarchy of product design. (*See* ECF 63-3 at ECF p. 17-19.)

On this foundation, Mr. O'Donel opined that it would have been feasible for Bobst NA to have installed a light curtain on the panel or at the interior-side delivery area, and that Bobst NA's failure to do so was inadequate safeguarding. (*See* ECF at ECF p. 13-17.) As with his opinion about the interlocked guard, there is an adequate basis to present this

opinion to the jury. A light curtain was already present elsewhere on the machine, and Ewart confirmed that one could have been installed at either of the locations that Mr. O'Donel proposed. *See Bloom*, 2025 WL 2803913, at *11. Mr. O'Donel's expertise in using light curtains on paper-cutting machinery is particularly relevant to this determination. Accordingly, his failure to assess whether additional light curtains would have prevented the accident, test their feasibility, or provide calculations, drawings, or mock-ups of his alternative design are not grounds to exclude his opinion, and his light curtain opinion may be presented to the jury.

### 3.    Delivery Door

Bobst NA argues that the Mr. Donel's opinion that the Mastercut's delivery door malfunctioned is speculative and, therefore, unreliable because he bases it on surveillance footage that does not depict the door and on post-accident statements from GPI employees which only establish that the door was open when Mr. Montgomery was found. (ECF 63-1 at 13.) Bobst NA notes that Mr. O'Donel did not perform any tests on the delivery door to determine if it malfunctioned and that a test its employees performed two days after the accident found no evidence of malfunction. (*Id.*)

Plaintiff responds that substantial evidence circumstantially shows that the delivery door malfunctioned and was open at the time the accident occurred. (*See* ECF 70 at ECF p. 24.) Specifically, she argues that surveillance video showed the Mastercut in a non-operational state where the delivery tray should not have been able to lower. (*Id.*) She claims that the tray had to have been initially high enough for Mr. Montgomery (who was 5'9") to fit underneath it, so, in her view, it never could have reached the height at

which the delivery door automatically opens with his body below it. (*Id.*) Because Mr. O'Donel's opinion is based on his "subjective belief or unsupported speculation," his testimony will not be admitted at trial. *Paoli*, 35 F.3d at 742.

Mr. O'Donel claims in his report that Mr. Montgomery brought the Mastercut to a stop before entering it using the "quick-stop or controlled-stop features" because surveillance footage showed the machine was not operating. (ECF 63-3 at ECF p. 10.) Accordingly, he opines that the machine malfunctioned because the delivery plate should not have been able to lower in this state. (*Id.* at ECF p. 10-11.) However, the machine could have paused *without Mr. Montgomery using a stop button*. As Mr. O'Donel noted in his own report, the Mastercut stops running when a safety feature like a light curtain or interlocked guard is triggered. (ECF 63-3 at ECF p. 6.) The record also indicates that the Mastercut pauses when the pallet being loaded is full, but the machine's sensors do not detect an empty standby pallet waiting in the machine's interior. (*See* ECF 66-5 at ECF p. 518-19, 867; ECF 66-7 at ECF p. 262, 266 (Expert Report of J. Martens at 5, 9).) As any one of these conditions could have caused the Mastercut to pause, no direct evidence supports Mr. O'Donel's conclusion that Mr. Montgomery must have pressed a stop button before entering the Mastercut.

Mr. O'Donel next opines that the Mastercut malfunctioned because the delivery tray lowered while the delivery door was open. (ECF 63-3 at ECF p. 11.) In support, he cites to (1) Ewart's deposition testimony that the tray had to be elevated for Mr. Montgomery to fit underneath it and (2) evidence that the delivery door was open when Mr. Montgomery was found. (*Id.* at ECF p. 10-11.) But this evidence only establishes that

14

the delivery door was open by the time Mr. Montgomery was discovered, not that it was open when he entered the delivery area. Deposition testimony established that, if an empty standby pallet was not in place, the delivery tray with a full pallet would pause at roughly eighteen inches off the ground. (ECF 66-5 at ECF p. 751, 867.) It has not been established that Mr. Montgomery entered the machine while standing up at full height and, at around eighteen inches, a man of Mr. Montgomery's size lying prone could fit under the tray. If the Mastercut's sensors subsequently detected the metal of a standby pallet, the delivery door would open as the full pallet descended. (*See id.* at ECF p. 757, 867.) Thus, it is at least possible that the delivery door opened as the tray lowered onto Mr. Montgomery.

Mr. O'Donel also relies on a photograph of handwritten notes from GPI's Phoenixville facility documenting several "equipment issues: found by operators." (ECF 63-3 at ECF p. 11.)  Line number eight states: "Machine ran while delivery/blanking door was open and plate was up to the grid." (ECF 66-7 at ECF p. 4.) But there is no evidence that this issue concerned the Mastercut at issue in this litigation. GPI had at least five Bobst die cutting machines from Bobst NA at the Phoenixville facility, including the Mastercut. (*See* ECF 66-5 at ECF p. 630-31, 674.) Several Bobst NA and GPI employees testified at their depositions that they had never heard of such a malfunction affecting any Mastercut. (*See* ECF 66-5 at ECF p. 321-22, 457, 551, 583, 689.) Natalie Mayer, GPI's health, safety, and environment manager at the time of the incident, claimed that the issue had never been reported but that Bobst NA or GPI had nonetheless resolved it at some point. (*Id.* at ECF p. 355, 366.)  And critically, Mr. O'Donel acknowledged at his deposition

that Bobst NA employees tested the Mastercut two days after the incident and found no evidence of a malfunction. (ECF 66-5 at ECF p. 797.)

Bobst NA argues that Mr. O'Donel's failure to test the interlocked delivery door (*id.*) renders his opinion regarding a delivery door malfunction too speculative to be admissible because of this dearth of evidence. (ECF 63-1 at 13-14.) *See Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 221 (E.D. Pa. 2001) (excluding the testimony of an expert who "merely examined the [product] and concluded it could have been safer" and provided "*no objective anchor for his conclusions*" (emphasis added)); *Johnson v. SJP Mgmt. LLC,* No. 07-5545, 2009 WL 367539, at *13 (E.D. Pa. Feb. 12, 2009) (finding an expert's conclusions "unsupported by any evidence in the record" where they "appeared to be based . . . on an instinctive reaction to the materials" plaintiff's counsel had provided). Plaintiff responds that under Pennsylvania law she may sustain a malfunction theory based on circumstantial evidence alone. (*See* ECF 70 at ECF p. 25.) *See Woodin v. J.C. Penney Co., Inc.*, 629 A.2d 974, 976 (Pa. Super. 1993) ("The malfunction theory allows the plaintiff to use circumstantial evidence to establish a defective product."). But here, *no* circumstantial evidence supports Mr. O'Donel's opinion.  He admitted as much when he testified at his deposition that "we don't know one way or another when [the delivery] door opened." (ECF 66-5 at ECF p. 797; *see also id.* at ECF p. 812 (admitting that it is possible that the Mastercut had not malfunctioned).)

The Mastercut was commissioned in early 2020 (*see id.* at ECF p. 495, 499, 889), and there is no evidence that its interlocked delivery door failed before Mr. Montgomery died. While the machine was damaged before then in a 2021 flood at the GPI facility (ECF 66-2

16

¶¶ 19-20), relevant to Plaintiff's claims against Bobst NA, this has no bearing on whether Bobst NA sold it in a defective condition.  *See Gaudio v. Ford Motor Co.*, 976 A.2d 524, 531 (Pa. Super. Ct. 2009) (noting that plaintiffs must show that a defect existed "when the product left the defendant's hands" in order to state a section 402A products liability claim); *Woodin*, 629 A.2d at 976-77 (affirming a judgment n.o.v. where the plaintiff's expert could not identify a defect in the allegedly defective freezer's power cord, the freezer had functioned without issue for eight years, and there was no circumstantial evidence to support a finding that it was defective *when sold*). Mr. O'Donel's conclusion that the delivery door malfunctioned is inadmissible because "there is simply too great a gap between the data and the opinion proffered." *Oddi*, 234 F.3d at 146 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

> **B.    Fit**

Bobst NA also argues that whether the delivery door malfunctioned is irrelevant to Plaintiff's claims and Mr. O'Donel's opinion to that effect will not assist the jury, *i.e*, it does not fit, because no evidence shows that Mr. Montgomery passed through it to enter the Mastercut. (ECF 63-1 at 14-15.) But this aspect of Plaintiff's manufacturing defect claim is not premised on Mr. Montgomery's route into the machine. Her claim instead relies upon Mr. O'Donel's conclusion that the delivery door was open while Mr. Montgomery was in the delivery area.  Supposing that to be true, the delivery tray should not have been able to lower while the delivery door was open, and Mr. O'Donel's opinion would be relevant to Plaintiff's manufacturing defect claim. *See Daubert*, 509 U.S. at 591.

Nevertheless, the issue is moot, as Mr. O'Donel's opinion is precluded because his conclusion is not reliable.

## IV.    CONCLUSION

For the reasons discussed above, Bobst NA's motion is granted to the extent that it seeks to exclude Mr. O'Donel's opinion as to the Mastercut's alleged malfunction. Bobst NA's motion is denied to the extent that it seeks to exclude Mr. O'Donel's opinions about the panel's guard design and whether additional light curtains should have been in place.

An appropriate Order follows.