# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TABRIA MONTGOMERY, | : | |
| Individually and as Administratrix | : | |
| of the ESTATE OF MICHAEL | : | CIVIL ACTION |
| MONTGOMERY, deceased, | : | No. 24-367 |
| *Plaintiff,* | : | |
| v. | : | |
| | : | |
| BOBST MEX SA, *et al.,* | : | |
| *Defendant.* | : | |

## MEMORANDUM

**HON. JOSÉ RAÚL ARTEAGA**                                              **April 22, 2026**
**United States Magistrate Judge[1]**

Plaintiff Tabria Montgomery's father, Michael Montgomery,[2] sustained fatal

injuries while operating a Bobst Mastercut 145 PER 2.0 Die-Cutter machine bearing Serial

No. BSA05662000208/1951 ("Mastercut"). (ECF 48 at ECF p. 5; *see also* ECF 58-1 ¶ 4.)  She

asserts claims individually on behalf of herself and her father's estate against Defendant

Bobst Group North America, Inc. ("Bobst NA"),[3] for strict products liability, negligence,

wrongful death, and survival and against Defendant Graphic Packaging International,

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c). (*See* ECF 25.)

[2] For clarity, this Opinion refers to Tabria Montgomery as Plaintiff and to Michael Montgomery as Mr. Montgomery.

[3] Although Plaintiff directs her claims against Bobst Group North America, Inc., it contends its "correct corporate name is Bobst North America, Inc." (ECF 17 ¶ 9; *see also* ECF 66-2 at ECF p. 1 ("Defendant Bobst North America, Inc., formerly Bobst Group North America, Inc.").)  The Court uses that name for purposes of this Opinion.

LLC ("GPI"), for negligence, wrongful death, and survival. (*See* ECF 1-1 at ECF p. 7-36.) Bobst and GPI assert crossclaims against each other seeking contribution and/or indemnification. (*See* ECF 29; ECF 44.)

Among numerous motions now pending before the Court is Plaintiff's Motion to Exclude the Expert Testimony of John Martens, Ph.D. (ECF 61.) Dr. Martens, Bobst NA's systems and controls engineering expert, opines that there is no evidence that the Mastercut malfunctioned based on his review of the evidence of record. (*See* ECF 61-3 at ECF p. 78-80 (Ex. G., Expert Report of J. Martens at 3-5).) He also opines that the Mastercut's and Mr. Montgomery's respective positions at the time when Mr. Montgomery was found are consistent with him having entered the machine while it was still running and having corrected the alignment of its parts. (*Id.* at ECF p. 80.) Plaintiff argues that Dr. Martens' opinions should be excluded because his methodology is unreliable. (ECF 61-1 at ECF p. 1-3.) Bobst NA responds that Dr. Martens' opinions are reliable because they are properly based on his review of the record and the Mastercut's control logic. (ECF 77 at 2-8.)

Upon review of the record and the parties' arguments, Plaintiff's Motion is denied, and Dr. Martens' opinions will not be precluded.

## I.      BACKGROUND

The Mastercut that Bobst NA sold to GPI takes pallets of cardboard blanks and cuts and processes them into food packaging. (ECF 66-2 ¶¶ 1-2.) In the machine's delivery section, a delivery plate holding a pallet receives finished cardboard product and lowers in a controlled manner as the pallet loads. (*Id.* ¶ 3; *see* ECF 66-5 at ECF p. 1013-14.) A

delivery door restricts access to the delivery area beneath the delivery plate during pallet loading, and a safety device called a light curtain[4] covers the gap between the door and the floor of the facility and stops machine motion when breached. (ECF 66-2 ¶ 4.) When the delivery tray is fully loaded with a pallet of product, it lowers onto the conveyor, the delivery door opens, and the pallet is transported out the delivery area. (*Id.* ¶ 5.)

The Mastercut was designed and manufactured with safety features, including light curtains, movable interlocked guards which prevent machine motion when opened, and emergency stop switches at select locations. (*Id.* ¶ 8.) It also employs sensors in and around its delivery area to prevent collision of machine parts. (ECF 66-5 at ECF p. 451-53, 867.) Among other things, the sensors detect the positions of the delivery plate and a standby plate positioned inside the machine which waits to move into the production zone. (*Id.* at ECF p. 451-53, 499-500, 518, 867.) The sensors are magnetic switches that detect metal only, not the human body. (*Id.* at ECF p. 518, 860.) When they sense that a plate is out of place, the Mastercut stops running. (*Id.* at ECF p. 500, 518-19, 867.)

The Mastercut has a raised operator platform where GPI's die cutter operators stand while working. (*See* 66-2 ¶¶ 12; ECF 66-5 at ECF p. 977.) A side panel of the operator platform equipped with fixed guards ("the panel") separates the interior of the Mastercut from its exterior. (*See* ECF 66-2 ¶¶ 9-10.) GPI employees removed the panel at some point

---

[4] Light curtains emit infrared beams that create an invisible barrier which protects workers from hazardous machinery. Light curtains typically send a signal for a machine to stop running when the light barrier is penetrated. (*See* ECF 66-5 at ECF p. 173.) *See Martinez v. Triad Controls, Inc.*, 593 F. Supp. 2d 741, 748 (E.D. Pa. 2009).

to gain access to the underside of the operator platform. (*Id.* ¶ 12; ECF 66-5 at ECF p. 1015.)

Mr. Montgomery was employed by GPI and was working as a die cutter operator on the Mastercut on February 6, 2022 at GPI's Phoenixville, Pennsylvania location. (ECF 66-2 ¶¶ 24-25; ECF 1-1 at ECF p. 12.) Surveillance video recorded during his shift shows that the panel was removed and leaning against the Mastercut, leaving an opening under the operator platform. (ECF 66-2 ¶ 26.) Mr. Montgomery passed through the opening at 2:52 p.m. without first pressing an emergency stop button or locking out the machine to power it down. (*Id.* ¶¶ 27-29.) He was found dead about one and a half hours later under a loaded pallet in the delivery area. (*Id.* ¶¶ 30-32.) His cause of death was traumatic asphyxiation. (*Id.* ¶ 32.)

In the expert report he prepared for Bobst NA, Dr. Martens states that the Mastercut's control logic operates to open the delivery door as a full pallet is lowered and then discharged. (ECF 61-3 at ECF p. 121-22.) He asserts that if a standby pallet is not in place below the operator platform, the Mastercut lowers the delivery tray to a height of 450 millimeters above the ground and the delivery door remains closed. (*Id.* at ECF p. 119.) According to Dr. Martens, once the Mastercut senses a standby pallet, the delivery door will open even if an obstacle prevents the delivery plate from reaching the ground. (*Id.* at ECF p. 123.) Accordingly, he opines that there is no evidence that the delivery door opened out of sequence. (*Id.* at ECF p. 122.) Instead, he opines that the evidence is consistent with Mr. Montgomery having entered the Mastercut while it was still running and having kicked the standby plate into position. (*Id.* at ECF p. 123.)

## II.    LEGAL STANDARD

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017). Consistent with this, "[t]he [Federal] Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). So, "Rule 702, which governs the admissibility of expert witness testimony, has a liberal policy of admissibility." *Id.*

A witness qualified to provide expert testimony is permitted to give testimony that would otherwise be impermissible, if the proponent of the qualified expert shows by a preponderance of the evidence that (1) "the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

To be reliable, an "expert does not have to be right." *United States v. Anderson*, 171 F.4th 232, 236 (3d Cir. 2026). Reliability is a "lower" bar "than the merits standard of correctness." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999). A reliable opinion need not

5

have "the best foundation" or even be "supported by the best methodology or unassailable research." *Karlo*, 849 F.3d at 81. It cannot, however, be based "on subjective belief and unsupported speculation." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833-34 (3d Cir. 2020). "Determining reliability is not a check-the-box exercise," and the Court has "significant autonomy to do the necessary work." *Anderson*, 171 F.4th at 236. Factors to consider include "testability, peer review, error rates, existence of standards, and general acceptance of the method." *Id.* Courts may also weigh the relationship of an expert's technique used to methods that have previously been established to be reliable and "the non-judicial uses to which the method has been put." *Cohen v. Cohen*, 125 F.4th 454, 462 (3d Cir. 2025).

## III.    DISCUSSION

Plaintiff contends that while Dr. Martens qualifies as an expert, his methodology is unreliable, so his opinions should be excluded pursuant to Rule 702. (ECF 61-1 at ECF p. 2.) She argues that his opinion about the evidence being consistent with Mr. Montgomery having realigned the standby plate and activated the Mastercut's sensors is speculative. (*Id.* at ECF p. 18-19.) She also maintains that Dr. Martens' opinions are unsupported because he could not confirm that the version of the control logic that he analyzed was the version in use on the Mastercut at the time of the incident. (*Id.* at ECF p. 19-20.) Her arguments are addressed in turn.

### A.    SQ110 and SQ111 Sensors

Plaintiff argues that Dr. Martens should be precluded from offering his opinion about the Mastercut's sensors because there is no evidence that (1) Mr. Montgomery was

physically capable of reaching the standby plate while standing in the delivery area or (2) did, in fact, realign the plate. (*Id.* at ECF p. 18.)  She asserts that Dr. Martens' opinion is "illogical" because Mr. Montgomery could have adjusted the standby plate without entering the delivery area. (*Id.* at ECF p. 19.) Bobst NA responds that Dr. Martens does not opine as to what *actually* happened; he merely suggests a sequence of events that is consistent with the evidence. (*See* ECF 77 at 3-4.) Bobst NA argues that Plaintiff is challenging the factual assumptions underlying Dr. Martens' analysis, which is a dispute that goes to the weight of his testimony, not its admissibility. (*Id.* at 3, 5.)

Dr. Martens' opinion about Mastercut's sensors is reliable and may be presented to a jury. Plaintiff's design and liability expert, Brian O'Donel, P.E. opined that (1) Mr. Montgomery stopped the Mastercut before entering it using the "quick-stop or controlled-stop features," and (2) the Mastercut malfunctioned by allowing the delivery tray to descend and crush Mr. Montgomery because it should not have been able to move with the delivery door open. (ECF 61-3 at ECF p. 46-47, 73 (Ex. F, Expert Report of B. O'Donel at 9-10, 36).)  The opinion Dr. Martens offers in his rebuttal report centers on his dispute of both of Mr. O'Donel's opinions as unsupported by the evidence of record.[5]  Dr. Martens does not definitively opine as to Mr. Montgomery's actions before his death.[6] (*See id.* at ECF p. 122-23.)  The Court evaluates his methodology through this lens.

---

[5] As set forth in the Court's ruling on Bobst NA's Motion to exclude Mr. O'Donel's testimony (ECF 63), Mr. O'Donel's opinion about the delivery door's malfunction is speculative and, thus, may not be admitted.

[6] Plaintiff claims Dr. Martens' opinion is that Mr. Montgomery died because he kicked the standby pallet into place. (ECF 79 at 2.) However, Dr. Marten merely opined

In rendering his opinion, Dr. Martens relied on his significant education and experience.[7]  He reviewed the Mastercut's original control logic,[8] videos of its operation, electrical diagrams, deposition transcripts, and the declaration of Tracy Whipple (*id.* at ECF p. 118, 121; ECF 66-5 at ECF p. 749, 758), Bobst NA's field service technical specialist. (ECF 66-5 at ECF p. 852.)  Dr. Martens also talked with Bobst NA engineers to understand the design and function of the Mastercut's electronic systems. (ECF 61-3 at ECF p. 118; ECF 66-5 at ECF p. 755, 758.)

From his investigation, Dr. Martens states that the Mastercut is equipped with "dual electronic systems that control the operational and safety behavior of the machine" in addition to its mechanical safeguards. (ECF 61-3 at ECF p. 117.) He notes that the industrial personal computer "monitors sensor and switch activation" in normal

---

that this "could have happened." *See Langbord v. U.S. Dep't of the Treasury*, No. 06-5315, 2009 WL 1312576, at *6 (E.D. Pa. May 7, 2009.) Opinions expressing a possibility are admissible so long as they otherwise comport with the *Daubert* analysis.  *See United States v. Ford*, 481 F.3d 215, 221 (3d Cir. 2007).

[7] Dr. Martens holds multiple degrees, including a Ph.D. in electrical engineering. (ECF 61-3 at ECF p. 77.)  He is a licensed professional engineer in several states and has over twenty-five years of experience with systems and controls. (*Id.* at ECF p. 77-78; *see also id.* at ECF p. 128-38 ("Résumé of John Martens").)

[8] "Control logic" is the "electronic circuitry that generates, interprets, and uses control data." *Razor USA LLC v. DGL Grp., Ltd.*, No. 19-12939, 2021 WL 651257, at *11 (D.N.J. Feb. 19, 2021). Dr. Martens also referred to the Mastercut's "logic" as "programming" or "code." (*See* ECF 61-3 at ECF p. 129; ECF 66-5 at ECF p. 748.) In his deposition, Dr. Martens explained that Bobst NA's counsel represented that the control logic Dr. Martens used to form his opinion was "equivalent to what[ was] running in the [Mastercut]" at the time of the incident. (ECF 66-5 at ECF p. 748.) For clarity, the Court refers to the code that Dr. Martens reviewed as the Mastercut's "original control logic."

operating modes, "changing its internal state and activating its actuators based on planned machine motions and fault conditions," while the safety programmable logic controller "independently monitors for events such as guard openings and emergency-stop switch activations, halting the machine when needed." (*Id.* at ECF p. 117-18) Dr. Martens claims that a fully loaded pallet stops at a height of 450 millimeters (approximately 18 inches) off the ground unless a standby plate is in place, "activating both of the proximity sensors under the platform, SQ110 and SQ111." (*Id.* at ECF p. 120-21.) According to Dr. Martens, once SQ110 and SQ111 register metal, the control logic immediately tells the delivery door to open while simultaneously lowering the pallet to the ground for delivery. (*Id.* at ECF p. 121-23.)

Dr. Martens notes that his understanding of the relevant control logic is supported by Mr. Whipple's post-incident test of the Mastercut. (*Id.* at ECF p. 121.) There, Mr. Whipple prevented the standby plate from moving into position, so a fully loaded pallet paused off the ground. (*Id.*) Once Mr. Whipple "used a metal pole to make contact with the standby plate sensor,"[9] the pallet "immediately started to lower to the ground and was delivered out through the delivery door." (*Id.*; *see* ECF 66-5 at ECF p. 867, 971-72.)

Based on Dr. Martens' analysis and because eyewitness statements established only that the delivery door was open by the time Mr. Montgomery was discovered (ECF

---

[9] Mr. Whipple only mentioned contacting one of the sensors with the metal pole. (*See* ECF 66-5 at ECF p. 972.) At his deposition, Dr. Martens confirmed that both SQ110 and SQ111 would have to detect metal for the Mastercut to resume operating. (*See id.* at ECF p. 762.) He suggested that Mr. Whipple's declaration was missing details and that the standby plate may have been triggering one of the sensors during the test. (*See id.*)

66-5 at ECF p. 929; ECF 66-7 at ECF p. 20), Dr. Martens opines that there is no evidence that the Mastercut malfunctioned. (ECF 61-3 at ECF p. 122.) He also opines that there is no evidence that Mr. Montgomery put the Mastercut in a stopped state because "the stopping of cutting action visible in the surveillance video" can be explained by the machine automatically stopping based on its programming. (*Id.* at ECF p. 123.) Dr. Martens opines that the circumstances giving rise to this litigation are "explainable by normal operation of the machine sequencing" if Mr. Montgomery entered the Mastercut while it was still running and repositioned the standby plate into place. (*Id.* at ECF p. 122-23.) In that case, Mr. Montgomery would have triggered the SQ110 and SQ111 proximity sensors, causing the delivery door to open and the full pallet to lower.  (*Id.*)

Because Dr. Martens bases his opinion on his experience, the evidence of record, and the original control logic, there are "good grounds" for his opinion to satisfy Rule 702.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). While Plaintiff disagrees that the evidence supports Dr. Martens' suggested version of events and faults him for not testing whether Mr. Montgomery could adjust the standby plate from the delivery area (ECF 61-1 at ECF p. 18), Bobst NA need not "show that [Dr. Martens'] opinions are necessarily correct." *Penn-Dion Corp. v. Great Am. Ins. Co. of N.Y.*, No. 17-4634, 2022 WL 20742700, at *1 n.1 (E.D. Pa. Apr. 20, 2022) (citing *In re Paoli*, 35 F.3d at 744); *see also In re TMI*, 193 F.3d at 665 ("The admissibility inquiry thus focuses on principles and methodology, not on the [expert's] conclusions . . . ."). Dr. Martens is "permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." *Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. 2002); *see*

*Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (noting that the burden is on opposing counsel to cross-examine experts on the facts and assumptions underlying their testimony).  Regardless, Dr. Martens clarified at his deposition that he was merely "explain[ing] what would happen if [Mr. Montgomery] did satisfy" the SQ110 and SQ111 sensors.  (ECF 66-5 at ECF p. 754.)  He did not conclusively opine on Mr. Montgomery's actions in his last moments.  Rather, Dr. Martens applied his expertise to describe how the relevant respective locations of Mr. Montgomery and the Mastercut's components could be explained by the Mastercut's electrical systems and controls.

Because Dr. Martens circumscribed his opinion in accordance with the evidence of record, his opinion as to the SQ110 and SQ111 sensors is reliable and will not be excluded.

### B.    Control Logic

Plaintiff also argues that Dr. Martens' opinions are unreliable because he analyzed the original control logic and could not personally confirm that it was equivalent to the control logic in the Mastercut at the time of the incident.  (ECF 61-1 at ECF p. 19-20.)  Bobst NA responds that while some of the Mastercut's electronics were replaced following a flood, there is no evidence that its operational programming (*i.e.,* the original control logic) was ever modified.  (ECF 77 at 5-6.)  Bobst NA contends that Dr. Martens has done "precisely what a qualified engineering expert" must do: evaluate the available technical materials, analyze the control system, compare that analysis with the documented operation of the machine, and confirm that the control logic is consistent with the other evidence of record.  (*Id.* at 5-8.)

11

Dr. Martens' opinions are not inadmissible based on his analysis's use of the original control logic. Plaintiff only offers speculation that the Mastercut's programming was altered after its installation. Her unsupported claim does not "offer any legitimate grounds for precluding" Dr. Martens' opinions. *See Center City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 205 (E.D. Pa. 2017) (denying the plaintiffs' motion to exclude expert testimony where they did not identify any evidence that would have led the expert to a different conclusion). Again, in rendering his opinions, Dr. Martens relied on the Mastercut's original control logic, electrical diagrams, videos of its operation, deposition transcripts, his conversations with Bobst NA's engineers, and Mr. Whipple's declaration. (ECF 61-3 at ECF p. 118, 121; ECF 66-5 at ECF p. 749, 755, 758.) Plaintiff points to no authority to show that an engineering expert may not base an opinion on such evidence. (*See* ECF 61-1 at ECF p. 19-20; ECF 79 at 3-4.) Dr. Martens testified that the evidence he reviewed to reach his conclusion was consistent with the original control logic and the control logic in the Mastercut at the time of the incident being equivalent to each other. (*See* ECF 66-5 at ECF p. 748-49, 755.) This is sufficient for purposes of a Rule 702 analysis.

Accordingly, Dr. Martens' opinions are not unreliable due to his analysis of the Mastercut's original control logic.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiff's Motion to exclude Dr. Martens' opinions is denied. Plaintiff can test them—including their underlying facts and

12

assumptions—through cross-examination and competing expert testimony at trial. *See*

*Stecyk*, 295 F.3d at 414.

An appropriate Order follows.