### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TABRIA MONTGOMERY,** | : | |
| **Individually and as Administratrix** | : | |
| **of the ESTATE OF MICHAEL** | : | **CIVIL ACTION** |
| **MONTGOMERY, deceased,** | : | **No. 24-367** |
| *Plaintiff,* | : | |
| **v.** | : | |
| | : | |
| **BOBST MEX SA,** *et al.,* | : | |
| *Defendant.* | : | |

### MEMORANDUM

**HON. JOSÉ RAÚL ARTEAGA**                                                          **April 30, 2026**
**United States Magistrate Judge[1]**

Plaintiff Tabria Montgomery asserts claims individually on behalf of herself and

her father's estate against Defendant Bobst Group North America, Inc. ("Bobst NA"),[2] for

strict products liability, negligence, wrongful death, and survival.[3] Her father, Michael

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c).  (*See* ECF 26.)

[2] Although Plaintiff directs her claims against Bobst Group North America, Inc., it contends its "correct corporate name is Bobst North America, Inc."  (ECF 17 ¶ 9; *see also* ECF 66-2 at ECF p. 1 ("Defendant Bobst North America, Inc., formerly Bobst Group North America, Inc.").)  The Court uses that name for purposes of this Opinion.

[3] Plaintiff also asserted claims against Defendant Graphic Packaging International, LLC ("GPI"), for negligence, wrongful death, and survival (*see* ECF 1-1 at ECF p. 7-36), but GPI moved for summary judgment (ECF 58), and Plaintiff presented no genuine issue for trial with respect to her claims against it, so the Court granted GPI's motion for summary judgment as to those claims.  (ECF 135; ECF 136.)

In addition, Bobst NA and GPI asserted crossclaims against each other seeking contribution and/or indemnification. (*See* ECF 29; ECF 44). Bobst NA's crossclaims

Montgomery,[4] sustained fatal injuries while operating a Bobst Mastercut 145 PER 2.0 Die-Cutter machine bearing Serial No. BSA05662000208/1951 ("Mastercut").  (ECF 48 at ECF p. 5; *see also* ECF 58-1 ¶ 4.)

Among several motions now pending before the Court is Bobst NA's Motion to Exclude the Expert Testimony of Kristin K. Kucsma, M.A. (ECF 65.) Ms. Kucsma, Plaintiff's economic expert, opines that "the total present value of the past and future pecuniary losses resulting from" Mr. Montgomery's death amounts to $2,116,040. (ECF 65-3 at ECF p. 6 (Ex. A, Expert Report of K. Kucsma & K. Betz at 3).)[5]  As part of her calculation, Ms. Kucsma includes damages for lost future earnings and loss of (1) companionship and (2) advice and counsel services to Mr. Montgomery's children. (*See id.* at ECF p. 16-21, 28-35.)  Bobst NA argues that Ms. Kucsma's opinions should be excluded because her methodology is unreliable and will not assist the trier of fact. (ECF 65-1 at 6-12.)  Plaintiff responds that Ms. Kucsma's opinions are reliable because the record supports them.  (ECF 72 at ECF p. 11-15.)  Plaintiff also argues that Ms. Kucsma's opinions as to non-economic damages will be helpful to the jury because she quantified intangibles using a mathematical formula.  (*Id.* at ECF p. 13-14.)

---

against GPI have been dismissed pursuant to the Pennsylvania Workers' Compensation Act.  (*See* ECF 135; ECF 136.)

[4] For clarity, this Opinion refers to Tabria Montgomery as Plaintiff, Michael Montgomery as Mr. Montgomery, and his son, Michael Montgomery, Jr., as Michael, Jr.

[5] Although Ms. Kucsma jointly renders her opinion with Kenneth T. Betz, M.A., both Bobst NA and Plaintiff refer only to Ms. Kucsma for purposes of this Motion.  (*See* ECF 65-1 at 1; ECF 72 at ECF p. 2.)

Upon review of the record and the parties' arguments, Bobst NA's Motion is GRANTED only in part: Ms. Kucsma's opinion about the number of hours that Mr. Montgomery provided companionship, advice, and counseling to his children and her corresponding damages calculations will not assist the jury and are, thus, inadmissible. In all other respects, Bobst NA's Motion is DENIED.

## I.    BACKGROUND

Mr. Montgomery was employed by GPI and was working as a die cutter operator on the Mastercut on February 6, 2022 (the date of his death), at GPI's Phoenixville, Pennsylvania location. (ECF 66-2 ¶¶ 24-25; ECF 1-1 at ECF p. 12 (Complaint).) He performed other roles during his employment with GPI, including feeder and glue machine operator. (*See* ECF 65-3 at ECF p. 155, 165 (Ex. C, Work Detail Report); *id.* at 181-87 (Ex. E, Evaluation Forms).)[6]  Employment records show that he was promoted to die cutter operator in January 2017 (*id.* at ECF p. 178) and then demoted to feeder in April 2019.  (*Id.* at ECF p. 176.)  Mr. Montgomery's annual income varied based on his rate of pay and regular and overtime hours worked.  (*See id.* at ECF p. 9, 151-74; ECF 72-1 at ECF p. 69-71 (Ex. E, Expert Report of J. Stavros at 6-8).)  Due to a flood at GPI's Phoenixville location (ECF 66-2 ¶ 19), Mr. Montgomery did not work for some time in 2021. (*See* ECF 65-3 at ECF p. 8; ECF 72-1 at ECF p. 69 n.14.)

---

[6]    The "feeder" role is alternatively titled "feeder/grabber," "feeder/grabber/sorter," "feeder catcher sorter," and "cutter feeder" in the record. (ECF 65-3 at ECF p. 155, 176, 182, 185-86.)

Mr. Montgomery had three adult children when he died: Plaintiff, Jabril Montgomery, and Michael, Jr. (collectively, "the children"). (*See* ECF 1-1 at ECF p. 9; ECF 65-3 at ECF p. 7.)  Jabril moved in with Mr. Montgomery in 2021 and was still living with him in February 2022. (ECF 65-3 at ECF p. 9; *id.* at ECF p. 191 (Ex. F, Dep. of J. Montgomery at 37).)

In the expert report she prepared for Plaintiff, Ms. Kucsma opines as to the amount of Mr. Montgomery's lost future earnings.  (*Id.* at ECF p. 21.)  As part of this calculation, she establishes his pre-incident annual earnings at $83,720 in 2020 dollars, noting that this figure represents "his earnings in his last full year of work."  (*Id.* at ECF p. 9.)  She also computes damages for loss of (1) companionship and (2) advice and counsel services to Mr. Montgomery's children in the amounts of $938,317 and $252,558, respectively.  (*See id.* at ECF p. 36.)

## II.    LEGAL STANDARD

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017).  Consistent with this, "[t]he [Federal] Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).  So, "Rule 702, which governs the admissibility of expert witness testimony, has a liberal policy of admissibility."  *Id.*

A witness qualified to provide expert testimony is permitted to give testimony that would otherwise be impermissible, if the proponent of the qualified expert shows by a preponderance of the evidence that (1) "the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

To be reliable, an "expert does not have to be right." *United States v. Anderson*, 171 F.4th 232, 236 (3d Cir. 2026). Reliability is a "lower" bar "than the merits standard of correctness." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999). A reliable opinion need not have "the best foundation" or even be "supported by the best methodology or unassailable research." *Karlo*, 849 F.3d at 81. It cannot, however, be based "on subjective belief and unsupported speculation." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833-34 (3d Cir. 2020). "Determining reliability is not a check-the-box exercise," and the Court has "significant autonomy to do the necessary work." *Anderson*, 171 F.4th at 236. Factors to consider include "testability, peer review, error rates, existence of standards, and general acceptance of the method." *Id.* Courts may also weigh the relationship of an expert's technique used to methods that have previously been

established to be reliable and "the non-judicial uses to which the method has been put." *Cohen v. Cohen*, 125 F.4th 454, 462 (3d Cir. 2025).

An expert's opinion "fits" when it is more likely than not that it will help the trier of fact with respect to the questions in the case at hand, a question that "goes primarily to relevance." *Daubert*, 509 U.S. at 591.

## III.    DISCUSSION

Bobst NA contends that while Ms. Kucsma qualifies as an expert, her methodology is unreliable and would not be helpful to the trier of fact, so her opinions should be excluded pursuant to Rule 702. (ECF 65-1 at 6-12.) It challenges her opinions about Mr. Montgomery's lost future earnings and intangible damages. (*Id.*) Bobst NA's arguments are addressed in turn.

### A.    Reliability

#### 1.    Lost Future Earnings

Bobst NA argues that Ms. Kucsma's selection of Mr. Montgomery's 2020 earnings as his "projected earnings base" is unsupported and "driven by assumptions supplied by counsel rather than by verifiable employment data." (*Id.* at 6-8.) It argues that 2020 was a "marked spike" in earnings because Mr. Montgomery worked significant amounts of overtime as a feeder that he never did as a die cutter operator. (*Id.*) Bobst NA also highlights that Ms. Kucsma could not state when Mr. Montgomery changed roles or how long he was out of work in 2021 during her deposition. (*Id.*)

Plaintiff responds that Ms. Kucsma properly based her lost future earnings opinion on her expertise and review of Mr. Montgomery's tax records and GPI's work

6

detail report.  (ECF 72 at ECF p. 11-12.)  Plaintiff contends that Ms. Kucsma appropriately relied on Mr. Montgomery's 2020 earnings because 2020 was his last full year of work before his death. (*Id.* at ECF p. 12.) Plaintiff also argues that Bobst NA's criticisms go to the weight of Ms. Kucsma's opinion, not its admissibility.  (*Id.* at ECF p. 12-13.)

Ms. Kucsma's opinion on Mr. Montgomery's lost future earnings is reliable and may be offered to a jury. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744-45 (3d Cir. 1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect."). She bases it on her significant knowledge, experience,[7] and review of the record, including GPI's work detail report, Mr. Montgomery's paystubs from November 2016 until February 2022, his federal tax documents from 2017 to 2022, and responses to a general "preliminary fact-finding questionnaire." (ECF 65-3 at ECF p. 8-9, 142 (Ex. B, Dep. of K. Kucsma at 62).) Ms. Kucsma also relies on "information provided by [Plaintiff's] counsel" (*id.* at ECF p. 8.), which presumably includes the questionnaire data. (*See id.* at ECF p. 141-42.) She testified that she confirmed this data through objective evidence such as Mr. Montgomery's W-2s, pay stubs, and tax documents. (*Id.* at ECF p. 132-33; ECF 72-1 at ECF p. 120-21 (Ex. H, Dep. of K. Kucsma at 100-01).)

Bobst NA repeatedly contends that Ms. Kucsma's deposition testimony shows that she relied on Plaintiff's counsel's representations rather than the objective record. (*See*

---

[7] Ms. Kucsma holds a master's degree in economics and has completed all requirements for a Ph.D. in economics except her dissertation. She has over thirty-years of experience teaching and consulting in economics, along with an extensive record of publications, presentations, speaking engagements, and conference involvement. (*See* ECF 65-3 at ECF p. 37-51.)

ECF 65-1 at 7 (challenging her testimony regarding when Mr. Montogomery transitioned to a new role and whether he had more opportunity for overtime); ECF 82 at 3-4 (same); *id.* at 5 (challenging her testimony regarding when or for how long the GPI facility was closed).) However, GPI's work detail report establishes Mr. Montgomery's changing work roles, pay rates, and overtime hours, as well as at least one gap in hours worked between September 1 and October 17, 2021. (*See* ECF 65-3 at ECF p. 154-55, 165-69.) Indeed, Bobst NA's own expert notes that he "can see the gaps in [Mr. Montgomery's] payroll records during [2021]." (ECF 72-1 at ECF p. 69 n.14.) Bobst NA's contention that Ms. Kucsma's memory lapses at her deposition mean she exclusively relied on Plaintiff's counsel's representations does not logically follow. (*See* ECF 65-1 at 7.) Her deposition testimony indicates the opposite. (*See* ECF 65-3 at ECF p. 138 ("Just because I don't remember all the details as I sit here today without the work detail report in front of me doesn't mean that I didn't review it and that it wasn't consistent with my conclusions about his changing roles and overtime hours worked." (citation modified)).) In any event, Bobst NA cites no authority for the proposition that an economics expert may not partially rely on an attorney's representations. *See Kremsky v. Kremsky*, No. 16-4474, 2017 WL 4466467, at *4 (E.D. Pa. Mar. 6, 2017) ("An expert can rely upon any information . . . assuming [he] can be examined on his opinions.").

Bobst NA also attacks Ms. Kucsma's conclusions as inconsistent with the record. It maintains that the work detail report shows Mr. Montgomery worked *less* overtime as a die cutter operator than as a feeder and only worked as a feeder in 2020. (ECF 65-1 at 7; *see* ECF 65-3 at ECF p. 151-74.) Bobst NA notes that Ms. Kucsma claims Mr. Montgomery

8

started transitioning to a new role in 2020 while he really began a four-month period as a die cutter operator in July 2021. (ECF 65-1 at 7-8; *see* ECF 65-3 at ECF p. 144-46, 154-55.) Accordingly, Bobst NA argues that Ms. Kucsma erroneously states in her report that Mr. Montgomery received more "overtime work and overall compensation" when he became a die cutter operator in 2021. (ECF 65-1 at 6-8; ECF 65-3 at ECF p. 8.)

These are not "significant error[s]" that go to the admissibility of Ms. Kucsma's opinion. *See Karlo*, 849 F.3d at 83. They go to its weight. Her opinion is not predicated on the various roles that Mr. Montgomery held but "is based specifically on what he actually had earned and was earning at or around the time of his death." (ECF 72-1 at ECF p. 121.) As such, she does not base her opinion on "speculative assumptions." *See Lawler v. Laidlaw Carriers Flatbed GP, Inc.*, 875 F. Supp. 2d 443, 449 (E.D. Pa. 2012).

Ms. Kucsma can rely on Mr. Montgomery's 2020 earnings because that figure is not "*substantially higher* than [his] average annual income." *Jacoby v. Admiral Merchs. Motor Freight, Inc.*, No. 08-145, 2010 WL 11694520, at *2 (W.D. Pa. Aug. 10, 2010) (emphasis added) (citing *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983)) (requiring a plaintiff's expert to use his calculation of the plaintiff's average gross income instead of the average national income for his occupation); *see Kali v. Lopez*, No. 24-4197, 2026 WL 624164, at *4 (E.D. Pa. Mar. 5, 2026) (finding a plaintiff's expert's opinion was unreliable where he used an average national income in his calculations that was about seventy-three percent more than the plaintiff's best earnings year). Bobst NA's expert opined that Mr. Montgomery's earning capacity was $77,573 annually based on his 2019, 2020, and 2021 earnings, which only $6,147 less than Ms. Kucsma's proffered figure. (*See* ECF 65-3

at ECF p. 9; ECF 72-1 at ECF p. 69.)  While a jury may find that "an average or median of Mr. Montgomery's earnings over several years is a more sensible approach" to calculate future earnings loss, Ms. Kucsma's use of Mr. Montgomery's last full year of earnings does not render her opinion unreliable for Rule 702 purposes.  *See Kalogerakis v. Chew*, No. 08-144, 2009 WL 3806452, at *3 (M.D. Pa. Nov. 12, 2009) (citation modified) (calculating lost future earnings based on the eight-year average of plaintiff's earnings despite his expert's trial testimony that his damages should be based on one year's earnings).

Therefore, Ms. Kucsma's opinion as to Mr. Montgomery's lost future earnings will not be precluded.

### 2.    Intangible Damages

Bobst NA argues that Ms. Kucsma's opinions regarding damages for loss of companionship and advice-related services are unreliable and unsupported. (ECF 65-1 at 9-12.) It maintains that Ms. Kucsma provides "no analysis" or peer-reviewed studies showing that parental interaction is economically equivalent to hourly wages for paid companions, social workers, and financial advisors. (*Id.* at 9-10.) Bobst NA challenges Ms. Kucsma's reliance on unrecorded phone interviews with Mr. Montgomery's adult children and notes the absence of any mechanism to verify that the reported frequency and duration of his children's interactions with him are consistent with their deposition testimony. (*Id.* at 10-11.)

Plaintiff responds that Ms. Kucsma's opinion is reliable because she based it on the phone interviews and applied peer-reviewed studies.  (ECF 72 at ECF p. 14.)  Plaintiff

10

asserts that Bobst NA's challenge is based only on contradictory record evidence which goes to the weight of Ms. Kucsma's opinion, not its admissibility. (*Id.*)

In rendering her opinion, Ms. Kucsma relied on certain facts and assumptions about Mr. Montgomery, his adult children, and their relationships. (*See* ECF 65-3 at ECF p. 7, 9-15, 28-35.) She determined these facts based on the preliminary fact-finding questionnaire and her telephone interviews. (*Id.* at ECF p. 9-12.) Bobst NA offers no legal support for its claim that economics experts may not use phone interviews to gather information about a family member's relationship with a decedent. While there are no transcripts of the calls, Ms. Kucsma testified at her deposition (*i.e.*, under oath) that she contemporaneously "memorialized" the relevant information into "what was a work in progress at the time that ultimately developed into the final report." (*Id.* at ECF p. 134.) There is no indication that Ms. Kucsma exaggerated, falsified, or misinterpreted the children's responses. Indeed, she testified that Mr. Montgomery's children had the opportunity to review the information in her report for its accuracy. (*See id.*) Bobst NA again takes issue with Ms. Kucsma considering the questionnaire (*see* ECF 65-1 at 10-11), but her testimony that she confirmed all relevant information within it during her phone interviews vitiates this argument in the context of her intangible damages opinion too. (*See* ECF 65-3 at ECF p. 143-44.)

Bobst NA's complaints largely center on Jabril's deposition testimony, which it contends is more reliable than his contradictory unsworn phone interview. (*See* ECF 65-1 at 11.) Bobst NA maintains that Ms. Kucsma's opinion is unreliable because it ignored what Jabril said at his deposition. (ECF 82 at 7.) Its arguments go to the weight of Ms.

Kucsma's opinion, not its reliability. *See Walker v. Gordon*, 46 F. App'x 691, 696 (3d Cir. 2002) ("[F]actual disputes are for the jury . . . .") Any dispute over the assumptions underlying her opinion is an appropriate topic for cross-examination and presentation of contrary evidence. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (noting that the Federal Rules of Evidence place "the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel"). Ms. Kucsma's testimony that she did not review the children's deposition transcripts because she "was able to obtain the information that [she] needed for" her opinion through the phone interviews suffices for the purpose of determining admissibility under Rule 702. (*See* ECF 65-3 at ECF p. 133.)

Moving to Ms. Kucsma's calculations, she cites *Mich. Cent. R.R. Co. v. Vreeland*, 227 U.S. 59, 71 (1913), and an economics book[8] for the proposition that the pecuniary value of intangible losses need only "be *measured by some standard*." (ECF 65-3 at ECF p. 22.) She submits that experts in federal court are "not bound by rigid methods of calculation" and must only prove a "reasonable expectation of loss of services by some method of calculation." (*Id.* at ECF p. 22-23 (citation modified).) Accordingly, Ms. Kucsma states that she "identified and valued measurable replacement services to arrive at a comprehensive and accurate valuation of the loss of" intangible services. (*Id.* at ECF p. 23 (citation

---

[8] *See* Thomas R. Ireland & Thomas O. Depperschmidt, Assessing Family Loss in Wrongful Death Litigation: The Special Roles of Lost Services and Personal Consumption 46-47, 284 (1999); *see also Lessert v. BNSF Ry. Co.*, 476 F. Supp. 3d 926, 955 & n.30 (D.S.D. 2020) (noting that Thomas R. Ireland, Ph.D., was a professor emeritus of economics in 2020), *vacated in part*, No. 17-5030, 2023 WL 3044752 (D.S.D. Apr. 20, 2023).

modified).)  Her valuations of these replacement services include (1) the survey-derived "market cost of paid companionship services" and (2) the average of hourly median wages in Pennsylvania for numerous roles, including teachers, financial managers, and residential advisors.  (*Id.* at ECF p. 28, 32.)  At her deposition, based on her experience and training, Ms. Kucsma testified that she followed "the generally accepted method among economists" to attribute a pecuniary value to the intangible losses for which Plaintiff seeks to recover.  (*See id.* at ECF p. 147-49.)

Although Ms. Kucsma's "qualifications profile" only identifies practice-oriented literature (as opposed to peer-reviewed studies) regarding her services-based approach to valuing loss of companionship and advice (*see id.* at ECF p. 39-56), that consideration is not dispositive under Rule 702. Ms. Kucsma's "proffered testimony is not scientific in nature," so her "methodology need not be subjected to rigorous testing for scientific foundation or peer review." *See Smithkline Beecham Corp. v. E. Applicators, Inc.*, No. 99-6552, 2001 WL 1526273, at *3 (E.D. Pa. Nov. 29, 2001). Here, Ms. Kucsma has "good grounds" for her opinion based on her professional experience as a forensic economist and her testimony that her application of a services-based valuation framework is generally accepted within the relevant professional community.  *See Paoli*, 35 F.3d at 742.[9]

---

[9] Bobst NA observes that, in an unpublished decision, the New Jersey Superior Court affirmed the trial court's finding that Ms. Kucsma's expert testimony was not credible because it was "not tethered to the facts." (ECF 82 at 7-8.) *See Est. of Tanaka by Rosello v. Kazary*, No. A-2072-20, 2023 WL 382310, at *5, *8 (N.J. Super. Ct. App. Div. Jan. 25, 2023). There, the trial court determined that Ms. Kucsma significantly inflated the amount of time the decedent would have provided to her parents and that the advice she provided to them was only "generalized statements" that did not give rise to a substantial loss. *Tanaka*, 2023 WL 382310, at *5. However, neither the trial court nor the defense expert

Therefore, Ms. Kucsma's opinion regarding Plaintiff's intangible damages is reliable and will not be excluded on that ground.

## B.    Fit

Bobst NA also argues that Ms. Kucsma's intangible damages opinion will not assist the jury, *i.e.*, it does not fit, because it "invades the province of the jury." (ECF 65-1 at 9-12.) It notes that Pennsylvania courts have held that intangible losses cannot be quantified by a mathematical formula and that jurors must use their experience to evaluate such damages.  (*Id.* at 9.)

Plaintiff counters that Ms. Kucsma's opinion will aid the jury because she properly used a mathematical formula to determine Plaintiff's noneconomic damages.  (ECF 72 at ECF p. 13-14.)

Pennsylvania's Wrongful Death Act, 42 Pa. Cons. Stat. § 8301, permits a decedent's children to recover non-economic damages for the value of their parent's services, including companionship, society, comfort, and guidance. *See Machado v. Kunkel*, 804 A.2d 1238, 1244-45 (Pa. Super. Ct. 2002); *see also Hatwood v. Hosp. of the Univ. of Pa.*, 55 A.3d 1229, 1235 (Pa. Super. Ct. 2012) ("[T]he definition of compensable services for the purpose of the [wrongful] death statute is similar to the definition of consortium as that term is applied in other negligence cases." (alterations in original)). Adult children like

---

in *Tanaka* challenged Ms. Kucsma's service-based valuation framework. In fact, it appears that, "based on the record and literature in the field," the defense expert simply reduced Ms. Kucsma's opinion as to damages in proportion to his estimate of the number of hours of services the decedent would have provided to her parents using Ms. Kucsma's same framework. *See id.* at *4-5.

Mr. Montgomery's may recover such damages under the wrongful death statute *if* they had a personal relationship with their deceased parent or received gifts or services from their parent "with sufficient frequency that it is reasonably certain that they would have continued had the parent not died." *In re Est. of Wolfe*, 915 A.2d 1197, 1200-01 (Pa. Super. Ct. 2006).

In diversity actions, federal courts "need not concern [them]selves with how a Pennsylvania court would rule, but can look to federal authorities favoring admissibility."[10] *See Haddigan v. Harkins*, 441 F.2d 844, 851-52 (3d Cir. 1970) ("[A]dmission of . . . expert testimony as to value of services presents only an evidentiary question[.]") Accordingly, federal courts have approved of "[e]xpert opinion evidence as to the monetary value of lost services in a wrongful death action." *Id.* (collecting cases); *see also*

_____

[10] Intangible losses intrinsically "must be measured by experience," so Pennsylvania courts "entrust jurors, as the impartial acting voice of the community, to quantify noneconomic loss and compensation." *Kimble v. Laser Spine Inst., LLC*, 264 A.3d 782, 801 (Pa. Super. Ct. 2021) (citation modified). Said differently, such damages "are obviously not susceptible to determination by a mathematical formula." *Id.*; *see also Nelson v. Airco Welders Supply*, 107 A.3d 146, 162 (Pa. Super. Ct. 2014) (noting that counsel "may not suggest an amount for damages incapable of measurement by a mathematical standard" (citation modified)). Still, Pennsylvania courts have allowed expert testimony on the monetary value of lost services in wrongful death actions. *See Walton v. Avco Corp.*, 557 A.3d 372, 388 (Pa. Super. Ct. 1989) (noting that expert testimony had established $43,428 as the "reasonable value for the loss of the [decedent's] household services," and affirming the grant of a new trial where no expert had "testified as to a figure which would compensate [the decedent's wife] for the loss of her husband's consortium" and the jury failed to award such damages), *aff'd in part, rev'd in part on other grounds*, 610 A.2d 454 (Pa. 1992); *see also Culbert v. Calderon*, 17 Pa. D. & C. 3d 499, 508-09, 1980 WL 550, at *6 (Pa. Ct. Comm. Pl. Chester Cnty. 1980) (collecting cases and stating that expert testimony "concerning the reasonable value of household services has been held in [Pennsylvania] to be admissible testimony").

15

*Morvant v. Constr. Aggregates Corp.*, 570 F.2d 626, 633-34 (6th Cir. 1978) (noting that it is within the trial court's discretion to determine when a plaintiff's testimony about the decedent's services will suffice and when an expert's "further testimony will aid the jury to make a reasonable evaluation of those services" (citation modified)). Where such testimony is admitted, "it should be followed by a charge that the expert's opinion is only advisory, and that the jury should make its own determination of the economic value of decedent's lost services." *See Haddigan*, 441 F.2d at 851-52 (holding that the trial court did not err in admitting testimony from an employment agency proprietor who estimated the value of the decedent's household services at $173.25 per week by applying prevailing hourly rates for comparable roles, such as hostess, seamstress, and housekeeper).

Recognizing that "the attempt to equate money with the loss . . . of advice, guidance and counsel for children . . . is truly an impossible task," *see Rodriquez v. United States*, 823 F.2d, 735, 749 (3d Cir. 1987), Ms. Kucsma's explanation of the pecuniary value of advice, counsel, and companionship services will be "helpful in providing the jury with guidance and in avoiding the potential for undue speculation." *Rosario v. City of Union City Police Dep't*, 131 F. App'x 785, 795 (3d Cir. 2005); *see Walton*, 557 A.3d at 388 (holding similarly under Pennsylvania law). Specifically, her testimony regarding the hourly rates for companionship and advice-related services will assist the jury in assigning value to Plaintiff's intangible losses. (*See* ECF 65-3 at ECF p. 28, 32-33.) However, testimony concerning the frequency with which Mr. Montgomery provided such services is more appropriately elicited from his children themselves.  Likewise, Ms. Kucsma's presentation of specific damages calculations—derived from mathematical

16

formulas incorporating the average hours of services rendered — would not assist the jury in assessing Plaintiff's damages. As such, "there is no need for her expert testimony on these issues." *See Keller v. Feasterville Fam. Health Care Ctr.*, 557 F. Supp. 2d 671, 687-88 (E.D. Pa. 2008) (citation modified).

Therefore, because it is not probable that they will help the jury with determining Plaintiff's intangible damages, the Court excludes Ms. Kucsma's opinions regarding the number of hours of advice, counseling, and companionship services Mr. Montgomery provided to his children, as well as the damages figures she derived from applying those hours into her mathematical formula.

## IV.    CONCLUSION

For the reasons discussed above, Bobst NA's Motion is granted to the extent it seeks to exclude Ms. Kucsma's opinions as to the number of hours that Mr. Montgomery provided advice, counseling, and companionship services to his children, as well as her calculation of Plaintiff's damages based on those estimates. Bobst NA's motion is denied to the extent that it seeks to exclude Ms. Kucsma's opinions about Mr. Montgomery's lost future earnings and the pecuniary value of advice, counseling, and companionship services.

An appropriate Order follows.