**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TABRIA MONTGOMERY, | : | |
| **Individually and as Administratrix** | : | |
| **of the ESTATE OF MICHAEL** | : | **CIVIL ACTION** |
| MONTGOMERY, deceased, | : | No. 24-367 |
| *Plaintiff,* | : | |
| v. | : | |
| | : | |
| BOBST MEX SA, *et al.,* | : | |
| *Defendant.* | : | |

**MEMORANDUM**

**HON. JOSÉ RAÚL ARTEAGA**                                                    **April 30, 2026**
**United States Magistrate Judge[1]**

Plaintiff Tabria Montgomery asserts claims individually on behalf of herself and

her father's estate against Defendant Bobst Group North America, Inc. ("Bobst NA"),[2] for

strict products liability, negligence, wrongful death, and survival.[3]  Her father, Michael

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c). (*See* ECF 26.)

[2] Although Plaintiff directs her claims against Bobst Group North America, Inc., it contends its "correct corporate name is Bobst North America, Inc." (ECF 17 ¶ 9; *see also* ECF 66-2 at ECF p. 1 ("Defendant Bobst North America, Inc., formerly Bobst Group North America, Inc.").)  The Court uses that name for purposes of this Opinion.

[3] Plaintiff also asserted claims against Defendant Graphic Packaging International, LLC ("GPI"), for negligence, wrongful death, and survival (*see* ECF 1-1 at ECF p. 7-36), but GPI moved for summary judgment (ECF 58), and Plaintiff presented no genuine issue for trial with respect to her claims against it, so the Court granted GPI's motion for summary judgment as to those claims. (ECF 135; ECF 136.)

In addition, Bobst NA and GPI asserted crossclaims against each other seeking contribution and/or indemnification. (*See* ECF 29; ECF 44). Bobst NA's crossclaims

Montgomery,[4] sustained fatal injuries while operating a Bobst Mastercut 145 PER 2.0 Die-Cutter machine bearing Serial No. BSA05662000208/1951 ("Mastercut").  (ECF 48 at ECF p. 5; *see also* ECF 58-1 ¶ 4.)

This Opinion considers Bobst NA's motion to exclude the expert testimony of Wayne Ross, M.D., P.C., one of several motions to exclude expert testimony in this case. (ECF 64.)  Upon review of the record and the parties' arguments, Bobst NA's Motion is DENIED for the following reasons.[5]

## I.    BACKGROUND

Dr. Ross is a forensic pathologist[6] who Plaintiff retained to offer opinions on the circumstances surrounding Mr. Montgomery's death, including the cause of death and the extent, if any, of his conscious pain and suffering.[7]  His experience includes personally

---

against GPI have been dismissed pursuant to the Pennsylvania Workers' Compensation Act.  (*See* ECF 135; ECF 136.)

[4] For clarity, this Opinion refers to Tabria Montgomery as Plaintiff and to Michael Montgomery as Mr. Montgomery.

[5] This Opinion does *not* decide the issues raised in Bobst NA's pending Motion in Limine to Preclude any References at Trial as to Decedent's State of Mind. (ECF 101.) There, Bobst NA seeks to preclude the introduction of "any and all references to any alleged thoughts or feelings experienced by Mr. Montgomery," including Dr. Ross' assertions "that Mr. Montgomery experienced fear, anxiety, and doom related to anxiety as he became trapped and slowly crushed, knowing he was dying." (ECF 101-1 at 3-4.) Bobst NA argues that such evidence would be more prejudicial than probative and is excludable pursuant to Federal Rule of Evidence 403. (*Id.* at 6.)

[6] Bobst NA does not object to Dr. Ross's qualifications.  (ECF 64-1 at 4.)

[7] The Pennsylvania Survival Act governs when an estate may recover for pain and suffering allegedly suffered by the estate's decedent and allows recovery for conscious pain and suffering from time of injury until death.  42 Pa. C.S.A. § 8302.

performing "hundreds, if not thousands, of autopsies." (Deposition of Wayne Ross, M.D. ("Ross Dep.") at 34, ECF 71-1 at ECF p. 25.)[8]  In his expert report, Dr. Ross explains that he used the "scientific method" to reach his opinion when he reviewed the report of Mr. Montgomery's autopsy, photographs from the autopsy and of the scene, an emergency medical services report, a police report, hospital records, and depositions and interview transcripts. (Expert Report of Dr. Wayne Ross ("Ross Report") at 1.)[9]; He explains that "[b]ecause [f]orensic pathologists are trained in and routinely rely on the scientific method when producing reports, another forensic pathologist can rely on the autopsy findings to determine the cause and mechanism of death." (*Id.*)  He also explains that "the degree of conscious pain and suffering can be determined by assessing the adequacy of the conscious areas of the brain during the event." (*Id.*) He testified that he began his hypothetical discussion by asking what the cause of death was and whether there was

---

[8] Because Plaintiff and Bobst NA append different excerpts from Dr. Ross's deposition testimony to their respective filings, citations to his deposition may be to pages from Bobst NA's Exhibit B (ECF 64-3 at ECF p. 13-25), its Reply Exhibit A (ECF 83-1), or to pages from Plaintiff's Exhibit D.  (ECF 71 at ECF p. 23-56.)

Neither party docketed its exhibits in full compliance with Local Rule of Civil Procedure 5.1.2(5)(b), which expresses the Court's preference to have each exhibit be "filed as a separately numbered attachment to the main document and . . . be clearly titled with an objective description of the document . . . so that the nature of the exhibit and its relevance are clearly discernible without the need to open the file." E.D. Pa. Loc. R. Civ. P. 5.1.2(5)(b).  Where that preference is not followed and exhibits are filed as a single pdf, they should be "accompanied by an index to the compilation providing the above information." *Id.*

[9] The Ross Report is available in the record at Bobst NA's Exhibit A (ECF 64-3 at ECF p. 1-12) and at Plaintiff's Exhibit C.  (ECF 71-1 at ECF p. 11-22.)

conscious pain and suffering. (Ross Dep. at 190, ECF 71-1 at ECF p. 48.)  From there, he gathered physical evidence and looked at documents including the articles and books in his list of references to draw conclusions regarding the cause of death and conscious pain and suffering considering "the physical evidence, . . . general medicine, . . . principles of neuropathology," and "pathophysiology." (Ross Dep. at 190-91, ECF 71-1 at ECF p. 48-49; *see also* Ross Report at 11.)  Dr. Ross testified that the articles he relied on in reaching his opinions "are meant to provide background information on how we get those sort of timing elements involved." (Ross Dep. at 138, ECF 71-1 at ECF p. 46.)

Dr. Ross opines that Mr. Montgomery's cause of death was traumatic asphyxiation, explaining that an "autopsy confirmed the findings of chest compression and asphyxia with petechial hemorrhages to the eyes and face, cyanosis, pulmonary edema and froth, [hypoxic ischemic encephalopathy ("HIE")] to the brain as well as findings of blunt force trauma including rib fractures and pleural lacerations from displaced ribs." (Ross Report at 9.) Dr. Ross also opines that Mr. Montgomery was "anatomically capable of experiencing conscious pain and suffering during the event that caused his death," noting that "the conscious areas of [his] brain were intact" during his autopsy. (*Id.* at 10.) In his opinion, the pain that Mr. Montgomery experienced "was severe, unrelenting, and extreme," and he "experienced fear, anxiety, and doom related anxiety as he became trapped and slowly crushed, knowing he was dying." (*Id.*)  Dr. Ross opines that Mr. "Montgomery experienced at least one minute to one and a half minutes of conscious pain and suffering." (*Id.*) He explains that "[d]uring asphyxia events, in about 30 seconds, there would be a decrease in heartrate or bradycardia.  As respirations

4

decreased, there would be agonal breathing with eventual stoppage of respirations.  This would lead to slowing and flattening of an electroencephalogram (EEG) which typically occurs at 90 seconds." (*Id.*) Dr. Ross opines that "[t]he transition to respiratory failure would cause agitation" and that Mr. Montgomery "experienced significant conscious pain and suffering" during the "[t]he time to flattening of the [EEG]," which included "headache, chest discomfort, and feelings of suffocation due to the inability to breathe in oxygen and breath[e] out carbon dioxide."  (*Id.*)  In Dr. Ross' opinion, "asphyxiation would not occur immediately," and instead, Mr. Montgomery's "airway would have become progressively blocked over some time due to chest compression and inability to breath[e], and he would have experienced a loss of oxygen reserves." (*Id.*) Dr. Ross opines that while Mr. Montgomery's "breathing rate and heart rate slowed down" and he "slowly suffocated, "he would have experienced conscious pain and suffering."  (*Id.*)

At his deposition, Dr. Ross testified that "typically" in cases involving chest compression injuries, "the right side of the heart is compressed, but the left side of the heart keeps beating."  (Ross Dep. at 60, ECF 71-1 at ECF p. 28.)  He explained that articles he had reviewed addressing injuries resulting from a hanging "point out that even if you compress the carotid arteries completely . . . and no blood supply is going to the brain, you still have 10 to 15 seconds of oxygenated blood in the brain and you can still experience conscious pain and suffering."  (Ross Dep. at 139, ECF 83-1 at ECF p. 13.)  He testified that Mr. Montgomery showed evidence of "petechial hemorrhages," which take "at least 15 to 30 seconds . . . to form" from the time when the right side of the heart is compressed, meaning "that Mr. Montgomery's death "was a slow process." (Ross Dep.

at 60-62, ECF 71-1 at ECF p. 28-30.) He testified that "when a person asphyxiates, for whatever reason, they get less and less oxygen in the system" and that "[a]fter 60 to 90 seconds, if you're not getting enough oxygen, that's called hypoxia, and then it goes to hypoxemia, which means all your blood in your body doesn't have enough oxygen." (Ross Dep. at 66-67, ECF 71-1 at ECF p. 34-35.)  He testified that "in 60 to 90 seconds" a person begins "to develop . . . semi-conscious states" and "the brain begins to swell." (Ross Dep. at 68, ECF 71-1 at ECF p. 36.) He testified that his opinion about "edema is based upon [his] looking at [the referenced] articles and looking at hypoxia and tying that in with the concepts of suffocation, how much time it takes for that to happen." (Ross Dep. at 210, ECF 64-3 at ECF p. 25.)  He acknowledged that the autopsy findings did not note brain edema but explained that he had "looked at a lot of brains and a lot of different timing issues" and suggested that the autopsy "missed" the issue. (*Id.*) Dr. Ross also testified that evidence of pulmonary edema and froth in the lungs suggested that Mr. Montgomery had not died "within seconds" because a "heart has to be failing ultimately for fluids to back up into the lungs and other parts of the body." (Ross Dep. at 69, ECF 71-1 at ECF p. 37.)

## II.    LEGAL STANDARD

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017).  Consistent with this, "[t]he [Federal] Rules of Evidence embody a strong preference for admitting any

evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). So, "Rule 702, which governs the admissibility of expert witness testimony, has a liberal policy of admissibility." *Id.*

A witness qualified to provide expert testimony is permitted to give testimony that would otherwise be impermissible, if the proponent of the qualified expert shows by a preponderance of the evidence that (1) "the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

To be reliable, an "expert does not have to be right." *United States v. Anderson*, 171 F.4th 232, 236 (3d Cir. 2026); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994) ("[T]he judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect."). Reliability is a "lower" bar "than the merits standard of correctness." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999). A reliable opinion need not have "the best foundation" or even be "supported by the best methodology or unassailable research." *Karlo*, 849 F.3d at 81. It cannot, however, be based "on subjective belief and unsupported speculation." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825,

7

833-34 (3d Cir. 2020). "Determining reliability is not a check-the-box exercise," and the Court has "significant autonomy to do the necessary work." *Anderson*, 171 F.4th at 236. Factors to consider include "testability, peer review, error rates, existence of standards, and general acceptance of the method." *Id.* Courts may also weigh the relationship of an expert's technique used to methods that have previously been established to be reliable and "the non-judicial uses to which the method has been put." *Cohen v. Cohen*, 125 F.4th 454 (3d Cir. 2025).

An expert's opinion "fits" when it is more likely than not that it will help the trier of fact with respect to the questions in the case at hand, a question that "goes primarily to relevance." *Daubert*, 509 U.S. at 591.

## III.   DISCUSSION

Bobst NA contends that while Dr. Ross qualifies as an expert, his methodology is unreliable and would not be helpful to the trier of fact, so his opinion should be excluded pursuant to Rule 702. (ECF 64-1 at 4.)

### A.   Reliability

Bobst NA acknowledges "that there is no single factor upon which the question of reliability turns," but argues that Dr. Ross's methodology led to unreliable conclusions, requiring that his testimony be excluded. (ECF 64-1 at 6-11.) Specifically, Bobst NA maintains that Dr. Ross used unreliable methods to reach his conclusion that Mr. Montgomery experienced sixty to ninety seconds of pain and suffering. (*Id.* at 8.) Bobst NA argues that "Dr. Ross has only established that Mr. Montgomery would have had ten to fifteen seconds of oxygen in his brain if the delivery plate prevented cardiac and

pulmonary function," and that even "assum[ing] that Dr. Ross is correct that Mr. Montgomery was still breathing or conscious in the fifteen to thirty seconds it would take for petechial hemorrhages to form," this would not allow him to reliably conclude that Mr. Montgomery "was conscious or experienced pain and suffering for sixty to ninety seconds." (*Id.* at 10.) It contends that "Dr. Ross makes an unreliable claim that Mr. Montgomery suffered from brain edema" and that, to reach this opinion, he "references studies on children who have been smothered that conveniently match the time frame of his conclusion." (*Id.*) Bobst NA faults Dr. Ross' failure to refer to articles "that detail the formation of petechial hemorrhages in adults with compression asphyxia injuries." (*Id.*) It also argues that Dr. Ross inappropriately relied on images of Mr. Montgomery's brain and its above-average weight to determine "that Mr. Montgomery suffered from brain edema which would have occurred over the sixty to ninety second period he believes Mr. Montgomery was conscious" when his autopsy report included no similar conclusion. (*Id.* at 9.)

Bobst NA seeks to exclude Dr. Ross' opinion based on its argument that Dr. Ross did not examine scientific literature as required, and instead cherry-picked studies to support his causal connections. (*Id.* at 6.) It contends that "*most* if not *all* the studies referenced by Dr. Ross do not allow him to establish a 'conservative baseline' from which he drew his conclusions regarding" Mr. Montgomery's compression asphyxia injuries. (ECF 83 at 2.) It focuses its criticism of Dr. Ross's report on its references to "studies pertaining to strangulation and suffocation events in children, examinations of hangings, and studies detailing the areas of the brain associated with fear response." (ECF 64-1 at

6.) Bobst NA explains that Dr. Ross did not address "either in his report or his deposition . . . why he believed that studies focusing on children and strangulation were more appropriate in his analysis than studies of adults and traumatic compression asphyxia injuries." (*Id.* at 7.)  Bobst NA complains that because Mr. Montgomery was an adult, Dr. Ross inappropriately relied on "[s]tudies addressing physiological responses in children during strangulation and smothering." (*Id.*)  It also argues that because there was "no indication that Mr. Montgomery experienced any pressure around his neck," Dr. Ross inappropriately relied on "studies examining physical responses from victims of hangings and smothering."  (*Id.*)  It argues that Dr. Ross failed to address why the studies that he relied on "were more appropriate to use than those pertaining to adults and compression asphyxia injuries."  (*Id.* at 7-8.)  In addition, Bobst NA argues that Dr. Ross' "reference to studies detailing fear response in the human brain" is not sufficient to show "that Mr. Montgomery either felt fear or that his pain and suffering lasted for between sixty and ninety seconds." (*Id.* at 8.) Bobst NA argues that "causal conclusions require examining the literature as a whole" and, in its view, Dr. Ross' methodology was, instead, more like cherry-picking.  (*Id.* at 6.)  *See Hoefling v. U.S. Smokeless Tobacco Co., LLC*, 576 F. Supp. 3d 262, 273 (E.D. Pa. 2021).

Plaintiff responds that Bobst NA has not shown that Dr. Ross cherry-picked sources from the medical literature, noting that it offers no "allegedly contradictory studies or medical literature" or other "literature that Dr. Ross allegedly ignored." (ECF 71 at ECF p. 13.)  She argues that Dr. Ross clearly testified that "he relied on the studies criticized by Bobst [NA] to establish a conservative baseline of the consciousness

timeline established by the medical literature" and that, from this baseline, he "then looked to the objective evidence in this case sourced from the autopsy report and autopsy photographs." (*Id.*) Plaintiff maintains that Dr. Ross' opinions are based on "the combination of all of this evidence, and not solely the medical literature" that Bobst NA criticizes. (*Id.*) She explains that to opine on Mr. Montgomery's conscious pain and suffering, Dr. Ross relied on medical literature in addition to the autopsy report and autopsy photographs, together with "his specialized knowledge, skill, training, and expertise—which includes performing approximately 15,000 autopsies." (*Id.* at ECF p. 12.) It is her position that Dr. Ross did "precisely" what he had explained during his deposition is the well-accepted practice in his field: gathered evidence, forensically analyzed it, and then "dr[e]w conclusions based on the principles of general medicine, neuropathology and pathophysiology. (*Id.* at ECF p. 13 (citing Ross Dep. at 189-92, ECF 71-1 at ECF p. 47-50).) She argues that Dr. Ross properly explained how the studies that he used "to demonstrate a conservative baseline for the consciousness timeline" "support his ultimate findings in conjunction with his review of the record evidence in this case." *(Id.* at ECF p. 14-15.) In her view, "all grievances Bobst [NA] has with Dr. Ross' opinions go to [their] weight rather than [their] admissibility." (*Id.* at ECF p. 9.)

Rule 702 "does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony." *VanDine v. Summit Treestands, LLC*, 738 F. Supp. 3d 599, 613 (E.D. Pa. 2024) (citation modified). Because peer review remains a "matter[ ] far afield from the expertise of judges," courts should exercise "great caution in deciding more than" is necessary. *Daubert*, 509 U.S. at 599 (Rehnquist, C.J., concurring

in part and dissenting in part).  So, "more often than not" the factfinder will be "permitted to hear the expert testimony, as parties' disputes or critiques regarding the testimony will go to its weight rather than admissibility." *In re Johnson & Johnson Talcum Powder Prods. Mktg.*, No. 16-MD-2738, 2026 WL 161184, at \*17 (D.N.J. Jan. 20, 2026).  When determining whether to admit expert testimony or not, the test "is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct." *Oddi* v. *Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000). Any gap between Dr. Ross' opinion and the information underlying it must be "extreme" and "clear" for it to be excluded as unreliable.  *Nichols v. Morrisey*, No. 23-637, 2024 WL 871322, at \*5 (E.D. Pa. Feb. 29, 2024). Moreover, Plaintiff is correct that a comment to the 2023 amendments to Rule 702 makes clear that "if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question weight and not admissibility."  Fed. R. Evid. 702, Advisory Committee's Note to 2023 Amendments. (*See* ECF 71 at ECF p. 15.)

While it is a close call, upon review, Dr. Ross's opinion is not based *only* on "subjective belief or unsupported speculation." *In re Paoli*, 35 F.3d at 742. While Bobst NA may disagree with the methods he used to reach his conclusions—formulating a hypothesis, analyzing available evidence and literature, and applying the principles of neuropathology—the methods used are enough to provide "good grounds" for his opinions under Rule 702. *Id. (*citing *Daubert*, 509 U.S. at 590). Bobst NA's concerns regarding the strength of the studies and evidence that Dr. Ross relied on to reach his

conclusions and the conclusions themselves can be challenged through vigorous cross-examination.

**B.     Fit**

Bobst NA also contends that Dr. Ross' opinions do not "fit" the facts of this case, arguing that they "will not assist a jury" and "would only serve to cause confusion and misunderstanding." (ECF 64-1 at 11.) It maintains that he "provides a description of asphyxia death as it would relate to either strangulation or suffocation, not to a compression asphyxia injury as experienced by Mr. Montgomery." (*Id.*) It argues that because the studies that Dr. Ross relied on do not "provide a *reliable* foundation" for his conclusions regarding Mr. Montgomery's conscious pain and suffering, his conclusions do not fit the facts of the case.  (ECF 83 at 7 (emphasis added).)

Plaintiff counters that "Dr. Ross' opinions are relevant for the purposes of this case and will assist the trier of fact," so they "fit." (ECF 71 at ECF p. 15.) She contends that Bobst NA's argument that his opinions do not fit effectively revisits its complaint that Dr. Ross improperly relied on articles pertaining to children instead of adults and to strangulation and suffocation asphyxia, instead of compression asphyxia. (*Id.*)

Plaintiff must "demonstrate[ ] by a preponderance of the evidence that . . . [Dr. Ross'] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Brooks v. Trans Union LLC*, No. 22-48, 2024 WL 3625143, at *3 (E.D. Pa. Aug. 1, 2024) (quoting Fed. R. Evid. 702).  Fit asks whether "there is a sufficient nexus between the expert's testimony and the facts that the jury is being asked to consider." *Bradley v. Amazon.com, Inc.*, No. 17-1587, 2023 WL

13

2574572, at *4 (E.D. Pa. Mar. 17, 2023) (citation modified), *reconsideration denied*, 2023 WL 2843788 (E.D. Pa. Apr. 6, 2023).  "Expert testimony which does not relate to *any* issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (emphasis added) (citation omitted).  That is not the circumstance here.

Plaintiff has shown that Dr. Ross's opinions fit the case because they have a nexus to and will assist the jury with the questions that jurors will be required to consider when determining whether Plaintiff can recover for survival.[10] Ultimately, Bobst NA's argument that Dr. Ross' opinions do not fit is a repackaged argument against their reliability. While his opinions will not be excluded under Rule 702, Bobst NA remains free to cross-examine Dr. Ross about them at trial.

## IV.    CONCLUSION

Bobst NA's motion to exclude Dr. Ross' expert opinions is denied for the reasons explained above. It can certainly test his opinions, including the methods he used and the basis for his conclusions—the underlying facts and assumptions—through vigorous cross-examination and the competing testimony of its own expert at trial.  *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

An appropriate Order follows.

---

[10] Indeed, Bobst NA seeks to proffer the opinion of its expert, Alfred Bowles, M.D., with respect to "the mechanism of injury and degree of conscious pain and suffering experienced by Mr. Montgomery during the incident that led to Mr. Montgomery's death."  (ECF 76 at 1.)

14