**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TABRIA MONTGOMERY, | : | |
| **Individually and as Administratrix** | : | |
| **of the ESTATE OF MICHAEL** | : | **CIVIL ACTION** |
| MONTGOMERY, deceased, | : | No. 24-367 |
| *Plaintiff,* | : | |
| v. | : | |
| | : | |
| BOBST MEX SA, *et al.,* | : | |
| *Defendant.* | : | |

**MEMORANDUM**

**HON. JOSÉ RAÚL ARTEAGA**                                                **July 1, 2026**
**United States Magistrate Judge[1]**

Plaintiff Tabria Montgomery asserts claims individually on behalf of herself and

her father's estate against Defendant Bobst Group North America, Inc. ("Bobst NA"),[2] for

strict products liability, negligence, wrongful death, and survival.  Her father, Michael

Montgomery,[3] sustained fatal injuries while operating a Bobst Mastercut 145 PER 2.0 Die-

Cutter machine bearing Serial No. BSA05662000208/1951 ("Mastercut").  (ECF 48 at ECF

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge
to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C.
§ 636(c). (*See* ECF 26.)

[2] Although Plaintiff directs her claims against Bobst Group North America, Inc., it
contends its "correct corporate name . . . is Bobst North America, Inc." (ECF 17 ¶ 9; *see
also* ECF 66-2 at 1 ("Defendant Bobst North America, Inc., formerly Bobst Group North
America, Inc.").) The Court uses that name for purposes of this Opinion.

[3] For clarity, this Opinion refers to Tabria Montgomery as Plaintiff and Michael
Montgomery as Mr. Montgomery.

p. 5.)  At the time of the incident, Mr. Montgomery was employed by Graphic Packaging International, LLC ('GPI") and working as a die cutter operator on the Mastercut at GPI's Phoenixville, Pennsylvania location.[4]  (ECF 66-2 ¶¶ 24-25; ECF 69 ¶¶ 24-25; ECF 66-5 at ECF p. 8; ECF 66-7 at ECF p. 336.)

Among several motions now pending before the Court, Bobst NA moves for summary judgment in its favor and asks the Court to dismiss all of Plaintiff's claims against it. (ECF 66.) Bobst NA argues that the Mastercut was not defective as designed, manufactured, and installed and that it cannot be liable to Plaintiff because Pennsylvania law bars a seller's liability where a safe product is made unsafe by subsequent changes that were not foreseeable and contrary to manufacturer warnings. (ECF 66-1 at 12-14, 16-17.)  Bobst NA also contends that there is no evidence in the record from which a jury can infer that the Mastercut malfunctioned. (*Id.* at 14-15.) Nor in its view can Plaintiff satisfy the duty, breach, or causation elements of her negligence claim based on the evidence of record. (*Id.* at 17-19.) Plaintiff responds that her claims should proceed to trial as, in her view, genuine issues of material fact remain with respect to whether the Mastercut malfunctioned or was defectively designed and whether GPI's post-sale modification

---

[4] Plaintiff also asserted claims against GPI, for negligence, wrongful death, and survival (*see* ECF 66-5 at ECF p. 2-30), but GPI moved for summary judgment (ECF 58) and the Court granted its motion.  (ECF 135; ECF 136.)

In addition, Bobst NA and GPI asserted crossclaims against each other seeking contribution and/or indemnification. (*See* ECF 29; ECF 44). Bobst NA's crossclaims against GPI were dismissed pursuant to the Pennsylvania Workers' Compensation Act. (*See* ECF 135; ECF 136.) Because GPI is no longer a party, Bobst NA's arguments concerning its crossclaims are moot.  (ECF 66-1 at 19-20.)

was foreseeable. (ECF 68 at ECF p. 18-33.)  She also argues that she has established a *prima facie* case of negligence against Bobst NA.  (*Id.* at ECF p. 33-34.)

Upon review of the record and the parties' arguments, and construing the evidence in the light most favorable to Plaintiff, genuine disputes of material fact remain with respect to Plaintiff's negligence and design defect claims. However, she has failed to adduce sufficient evidence to withstand summary judgment with respect to a manufacturing defect claim under Pennsylvania's "malfunction theory." She has also abandoned any claim for failure to warn.[5] Accordingly, Defendant's motion is **GRANTED IN PART** with respect to any claim asserting a manufacturing defect or failure to warn and **DENIED** in all other respects.

---

[5] Bobst NA argues that Plaintiff has failed to produce sufficient evidence to sustain a failure to warn claim.  (ECF 66-1 at 19-20.)  Plaintiff fails to respond to this argument. In distinguishing Bobst NA's reliance on *Chandler v. L'Oreal USA, Inc.*, 340 F. Supp. 3d 551, 562 (W.D. Pa. 2018), she clarifies that she is only pursuing "design defect claims and theories."  (*See* ECF 68 at ECF p. 23-24.)  She does so even though Counts I and II of her Complaint allege that Bobst NA failed to adequately warn Mastercut users (*see* ECF 66-5 at ECF p. 16-23) and her expert, Brian O'Donel, P.E., opines that Bobst NA's "failure to provide proper instruction/warning was a warnings defect." (ECF 66-7 at ECF p. 256.) By failing to respond to Bobst NA, Plaintiff has effectively waived any claim for failure to warn under Counts I and II of her Complaint.  *See e.g., Brewer v. Troy-Bilt LLC*, No. 22-CV-4505, 2023 WL 7167564, at *2 (E.D. Pa. Oct. 31, 2023) (holding a plaintiff abandoned a claim by not responding to the portion of the defendant's summary judgment motion that addressed it); *Hackett v. Cmty. Behavioral Health,* No. 03–6254, 2005 WL 1084621, *6 (E.D. Pa. May 6, 2005) (holding a failure to address claims waived the opportunity to contest summary judgment on that ground).

## I.    BACKGROUND

The Mastercut that Bobst NA sold to GPI takes pallets of cardboard blanks and cuts and processes them into food packaging. (ECF 66-2 ¶¶ 1-2.) The machine is roughly shaped like a rectangle. On one of the short sides of the rectangle, the "feeder side," raw material is fed into the Mastercut. (ECF 66-5 at ECF p. 294, 975-76; ECF 66-7 at ECF p. 265.) This material travels down a conveyor belt through the machine, passing through a platen press and stripping station before becoming finished cardboard product. (*See* ECF 66-5 at ECF p. 288; ECF 66-7 at ECF p. 265.) On one of the long sides of the rectangle, the "operator side," the Mastercut has a raised operator platform where GPI's die cutter operators stand while working. (*See* ECF 66-5 at ECF p. 253, 294, 977.) From this platform, operators can look through transparent windows/movable guards to observe the cardboard as it passes through the machine. (*Id.* at ECF p. 289; ECF 66-7 at ECF p. 51, 264.) The rectangle's other short side has a "waste removal system" which vacuums out paper waste created from the cardboard processing. (*See* ECF 66-5 at ECF p. 442; ECF 66-7 at ECF p. 264.)

The rectangle's other long side, the "opposite operator's side," houses the delivery section. (ECF 66-5 at ECF p. 441, 443, 979.) There, a delivery plate holding a pallet receives finished product and lowers in a controlled manner as the pallet loads. (ECF 66-2 ¶ 3; ECF 69 ¶ 3; *see* ECF 66-5 at ECF p. 1013-14.) A delivery door restricts access to the delivery area beneath the delivery plate during pallet loading, and a safety device called a light

curtain[6] covers the gap between the door and the floor of the facility and stops machine motion when breached.  (ECF 66-2 ¶ 4; ECF 69 ¶ 4; *see* ECF 66-5 at ECF p. 985.)  When the delivery tray is fully loaded with a pallet of product, it lowers onto a conveyor while the delivery door slowly opens, and the pallet is then transported out of the delivery area. (ECF 66-2 ¶ 5; ECF 69 ¶ 5; ECF 66-5 at ECF p. 616-17.)

The Mastercut was designed and manufactured with safety features, including light curtains, movable interlocked guards which prevent machine motion when opened, and emergency stop switches at select locations. (ECF 66-2 ¶ 8; ECF 69 ¶ 8.) It also employs sensors in and around its delivery area to prevent collision of machine parts. (ECF 66-5 at ECF p. 451-53, 867.)  Among other things, the sensors detect the positions of the delivery plate and a standby plate positioned inside the machine which waits to move empty standby pallets into the production zone.  (*Id.* at ECF p. 451-53, 499-500, 518, 867.) The sensors are magnetic switches that detect metal only, not a human body. (*Id.* at ECF p. 518, 860.) When they sense that a plate is out of place, the Mastercut stops running.  (*Id.* at ECF p. 500, 518-19, 867.) The Mastercut will also pause operating if a user (1) pushes the "quick stop" button, (2) pushes the "emergency stop" button that immediately de-energizes the main motor, (3) executes a "controlled stop," which slowly ramps down production of the machine until it reaches zero, (4) triggers another guard, such as

---

[6] Light curtains emit infrared beams that create an invisible barrier which protects workers from hazardous machinery.  Light curtains typically send a signal for a machine to stop running when the light barrier is penetrated. (*See* ECF 66-5 at ECF p. 173.) *See Martinez v. Triad Controls, Inc.*, 593 F. Supp. 2d 741, 748 (E.D. Pa. 2009).

opening one of the movable guards on the operator platform, or (5) completely de-energizes the machine following a lockout/tagout procedure (*i.e.*, using a lock to prevent the machine and an energy isolating device from being operated, and attaching a tag to the energy isolating device to warn others not to use the machine until the tag is removed). (*See id.* at ECF p. 448-49, 455, 506-07; ECF 66-7 at ECF p. 297.) *See* 29 C.F.R. § 1910.147(b) (defining lockout/tagout procedures and devices).

Side panels of the operator platform equipped with fixed guards separate the interior of the Mastercut from its exterior. (*See* ECF 66-2 ¶¶ 9-10; ECF 69 ¶¶ 9-10.) GPI employees removed one of these panels ("the panel") at some point to gain access to the underside of the operator platform. (ECF 66-2 ¶ 12; ECF 69 ¶ 12; ECF 66-5 at ECF p. 1015.)

Surveillance video recorded during Mr. Montgomery's shift on the day of the incident shows that the panel was removed and leaning against the Mastercut, leaving an opening under the operator platform. (ECF 66-2 ¶ 26; ECF 69 ¶ 26.) Mr. Montgomery passed through the opening at 2:52 p.m. without first pressing an emergency stop button or locking out the machine to power it down. (ECF 66-2 ¶¶ 27-29; ECF 69 ¶¶ 27-29.) He was found dead about one and a half hours later under a loaded pallet in the delivery area. (ECF 66-2 ¶¶ 30-32; ECF 69 ¶¶ 30-32.) His cause of death was traumatic asphyxiation. (ECF 66-2 ¶ 32; ECF 69 ¶ 32.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the movant, Bobst NA bears the initial responsibility for

informing the Court of the basis for its motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where a nonmoving party (here, Plaintiff) bears the burden of proof on a particular issue, Bobst NA's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once Bobst NA meets its initial burden, Plaintiff must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed R. Civ. P. 56(c).

The Court may consider any material in the record that may be admissible at trial. *See id.*; *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387-88 & n.13 (3d Cir. 1999). In doing so, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may the Court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of

the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence supporting the nonmoving party will not suffice to defeat summary judgment. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256 (citing Fed. R. Civ. P. 56(e)).

## III.    DISCUSSION

### A.    Strict Liability

Since jurisdiction in this action is based upon diversity, Pennsylvania products liability law applies to Plaintiff's claims. *Pavlik v. Lane Ltd./Tobacco Exps. Int'l*, 135 F.3d 876, 881 (3d Cir. 1998). Pennsylvania recognizes strict liability claims for defective product design under Section 402A of the Restatement (Second) of Torts. *Behrens v. Arconic, Inc.*, 429 F. Supp. 3d 43, 52 (E.D. Pa. 2019) (citing *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 399 (Pa. 2014)). Under Section 402A, a seller may be liable for physical harm caused by a product sold "in a defective condition unreasonably dangerous to the user or consumer." In *Tincher*, the Pennsylvania Supreme Court reaffirmed Section 402A's applicability while recognizing that a plaintiff may establish a design defect under either the consumer-expectations test or the risk-utility test. 104 A.3d at 400-01. This dual analytical structure invokes warranty and negligence theories, respectively. *See id.* at 403. Plaintiff's Complaint alleges that the Mastercut was defective under both theories. (ECF 66-5 at ECF p. 20.)

Bobst NA maintains summary judgment is appropriate on Plaintiff's claims based in strict liability because she has not presented sufficient evidence to establish that the Mastercut was defectively designed or to proceed to trial based on the malfunction

theory. It also argues that there is no material question of fact with respect to whether GPI's post-sale removal of the panel constituted a reasonably foreseeable and substantial modification of the Mastercut.  Its arguments are considered in turn.

**1.      Whether the Mastercut's Design Rendered It Defective When It Left Bobst NA's Control.**

Under the consumer-expectation standard, a "defective condition" is defined as a "condition, upon normal use, dangerous beyond the reasonable consumer's contemplations." *Tincher*, 104 A.3d at 387.  "The nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller are among considerations relevant to assessing the reasonable consumer's expectations." *Id.* In contrast, the risk-utility test asks whether "'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or cost of taking precautions." *Id.* at 389.  Relevant considerations include:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* at 389-90.

Bobst NA does not discuss the consumer-expectations or risk-utility tests in its Motion. It merely asserts that Plaintiff's design defect claim fails to withstand summary judgment because the Mastercut was not in a defective condition when it left Bobst NA's control. (*See* ECF 66-1 at 12-14; ECF 81 at 7-8.) *See Macaluso v. Apple Inc.*, No. 21-1361, 2023 WL 4685965, at *13 (E.D. Pa. July 21, 2023) ("[A] plaintiff must demonstrate . . . that the product was defective, that the defect caused the plaintiff's injury, and the defect existed at the time the product left the manufacturer's control." (quoting *Barnish v. KWI Bldg. Co.*, 980 A.2d 535, 541 (Pa. 2009))). Bobst NA contends that the Mastercut was safe as designed because it used fixed guards on the panels under the operator platform. (*See* ECF 66-1 at 13-14.)

Plaintiff responds that substantial evidence, particularly the expert opinion of her design and liability expert, Brian O'Donel, P.E., demonstrates that the Mastercut was defectively designed because the panel did not have an interlocked guard and/or it lacked additional light curtains on the interior of the panel or the interior of the delivery area. (ECF 68 at ECF p. 20-22.) She notes that Bobst NA did "not provide users with any instructions or directions on how or where to access the interior" and asserts that Bobst NA designed the fixed guard panels with "easily removable" screws because it was

aware that users would need to access Mastercut's interior to perform maintenance.  (*Id.* at ECF p. 20-21.)  Applying the risk-utility test to the evidence of record, Plaintiff argues that a reasonable jury could find that the probability and seriousness of harm caused by the Mastercut outweigh the cost to Bobst NA of implementing the proposed alternative design.  (*Id.* at ECF p. 22-23.)[7]

Bobst NA replies that it provided detailed instructions which required the Mastercut's main motor to be shut down using lockout/tagout procedures before anyone entered it. (ECF 81 at 7.) Bobst NA also argues that there is insufficient evidence to support Plaintiff's claim that it should have implemented Mr. O'Donel's proposed alternative designs because he failed to provide evidence of calculations, diagrams, or tests to support his opinion.  (*Id.*)

As to the latter contention, the Court already addressed Bobst NA's motion to preclude Mr. O'Donel's testimony on this ground (*see* ECF 63-1 at ECF p. 7-11) and found his opinion on alternative designs adequately supported and sufficiently reliable to present to a jury. (ECF 133 at 9.) His opinion and the competing opinion of Bobst NA's expert, Stephen Andrew, P.E., are admissible and appropriate for consideration.

Mindful that summary judgment is "inappropriate where the opinions and credibility of experts are in dispute," *see Elgert v. Siemens Indus., Inc.*, No. 17-1985, 2019 WL 1318569, at *10 (E.D.Pa. Mar. 22, 2019), Mr. O'Donel's opinions and the other evidence

---

[7] Because neither party discusses the consumer-expectations test as applied to the facts of this case, the Court does not consider whether the Mastercut was sold in a defective condition under that theory.

of record create a genuine issue of material fact as to whether the Mastercut was defective as designed under *Tincher's* risk-utility test. *See Elgert*, 2019 WL 1318569, at *9 (collecting cases and noting that "Pennsylvania courts have consistently held that questions arising under the risk-utility analysis should be reserved for a jury.")

Considering risk-utility factor two, *see Tincher*, 104 A.3d at 398, the reports of Mr. O'Donel and Bobst NA's mechanical engineering expert, Stephen Andrew, P.E., both establish that the moving machine parts in the Mastercut's delivery area presented a substantial risk of causing serious bodily injury to operators. (*See* ECF 66-7 at ECF p. 234, 280.) Appreciating that risk, Bobst NA attempted to safeguard the danger by using fixed guards on the panel and a light curtain underneath the delivery door. (ECF 66-2 ¶¶ 4, 9; ECF 69 ¶¶ 4, 9.)

Moving to risk-utility factor six, Mr. O'Donel testified at his deposition that he could not speak to Mr. Montgomery's appreciation of the danger in crawling beneath a loaded pallet but acknowledged that this behavior was not "a safe practice" or "something that would be done routinely" by operators. (ECF 66-5 at ECF p. 810.) Nevertheless, he opines that the Mastercut was designed with insufficient warnings of the crush hazard (both on its body and in its instruction manual).[8] (ECF 66-7 at ECF p.

---

[8] To the extent that Bobst NA is making a contributory negligence argument with its claim that Mr. Montgomery should have heeded its warnings to follow lockout/tagout procedures before entering the Mastercut (*see* ECF 66-1 at 14), his alleged negligence is no defense to a strict liability claim. Pennsylvania courts do not recognize contributory negligence in the context of strict liability claims because "the focus is on the nature of the product and the consumer's reasonable expectations with regard to the product, rather than upon the conduct of either the manufacturer or the person injured." *See Tincher*, 104 A.3d at 369; *see also Parks v. AlliedSignal, Inc.*, 113 F.3d 1327, 1334 (3d Cir. 1997)

237-38.) He also notes that Bobst NA failed to instruct users how to access the Mastercut's interior and asserts that, regardless, warnings could not replace the necessary higher orders of protection in his alternative design (*i.e.*, an interlocked guard and/or light curtain(s)). (*Id.*) Mr. Andrew provides a contrary opinion that the warnings on the Mastercut and in its owner's manual to de-energize the Mastercut and ensure all guards are in place before entering it were sufficient safeguarding and that the incident likely would not have occurred if GPI had heeded the warnings. (*See id.* at ECF p. 293-94.)

For risk-utility factors three and four, Mr. O'Donel opines that Bobst NA's failure to provide a safe alternative design using an interlocked guard on the panel or (an) additional light curtain(s) on the interior of the panel and/or on the interior side of the delivery area was a failure to properly safeguard the pinch point crush hazard in the delivery area. (*Id.* at ECF p. 232-33.) He asserts that it was feasible for Bobst NA to add these additional safeguards as it had already done so elsewhere on the machine. (*Id.* at ECF p. 236.) Mr. Andrew disputes Mr. O'Donel's proposed alternative design and opines that Bobst NA's use of fixed guards was sufficient safeguarding. (*Id.* at ECF p. 283-86.) He also disputes the feasibility of Mr. O'Donel's proposed alternative design, theorizing that falling scrap paper produced during cardboard processing would have triggered any additional light curtains under the Mastercut and caused unnecessary shutdowns. (*Id.* at ECF p. 298-99.) However, Mr. O'Donel testified that this was not a serious concern as

("[T]he underlying purpose of strict product liability is undermined by introducing negligence concepts into it." (quoting *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 606 (Pa. 1993))).

light curtains can be calibrated to avoid needless interruptions and "triggers that fast." (ECF 66-5 at ECF p. 806.) *See Hoffman v. Paper Converting Mach. Co.*, 694 F. Supp. 2d 359, 365-66 (E.D. Pa. 2010) (determining that summary judgment was inappropriate where experts had opposing opinions on whether a reasonable alternative design was feasible at the time of the product's sale). Relatedly, under risk-utility factor seven, Mr. O'Donel opines that his proposed alternative design would be "relatively inexpensive" considering that the "Mastercut is a multi-million dollar machine." (ECF 66-7 at ECF p. 235.)

Mr. O'Donel's opinion conflicts with Mr. Andrew's. Reasonable jurors could believe either expert's testimony at trial. *See Hoffman*, 694 F. Supp. 2d at 366 ("[T]his dispute will [b]e determined largely on the basis of expert credibility . . . .") As the Pennsylvania Supreme Court has explained, "the practical reality is that trial courts simply do not have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide, as a matter of law, whether a product is unreasonably dangerous except perhaps in the most obvious of cases (*e.g.*, where injury is caused by a knife)." *Tincher*, 104 A.3d at 380 (citation modified). This is not such an obvious case. *See Knight v. Avco Corp.*, No. 21-702, 2024 WL 3746269, at *35 (M.D. Pa. Aug. 9, 2024) ("Where there are, at minimum, genuine questions of fact as to five of the seven factors, summary judgment is inappropriate.").

Therefore, this dispute is not appropriate for resolution at the summary judgment stage, and Bobst NA's Motion is denied as to Plaintiff's design defect claim under Count I.

### 2. Whether the Malfunction Theory Shows that the Mastercut Was in a Defective Condition When It Left Bobst NA's Control.

Plaintiff also pursues a manufacturing defect strict liability claim under Pennsylvania's malfunction theory. (*See* ECF 68 at ECF p. 30-33.) Under that doctrine, a plaintiff may establish a defective condition through circumstantial evidence. *See Barnish*, 980 A.2d at 541–42. Nevertheless, "having an expert examine a product does not preclude a plaintiff from advancing the product malfunction theory of liability." *Pa. Nat'l Mut. Cas. Ins. Co. v. Sam's E., Inc.*, 251 A.3d 1250 (table), 2021 WL 1054384, at *4 (Pa. Super. Ct. Mar. 19, 2021) (citing *Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d 489, 495 (Pa. Super. Ct. 1997)). To sustain a malfunction theory claim, a plaintiff generally must produce evidence (1) "of the occurrence of a malfunction" and (2) "eliminating abnormal use or reasonable, secondary causes for the malfunction." *Barnish*, 980 A.2d at 541. The plaintiff must still establish that the product was defective when it left the manufacturer's control and "cannot depend upon conjecture or guesswork" to meet their burden. *Woodin v. J.C. Penney Co.*, 629 A.2d 974, 976 (Pa. Super. Ct. 1993).

Bobst NA argues that Plaintiff has failed to produce sufficient evidence to withstand summary judgment on her malfunction theory because Mr. O'Donel's opinion does not establish that a defect existed when the Mastercut left its control. (ECF 66-1 at 14-15.) Bobst NA maintains that the only evidence supporting the malfunction theory is that the Mastercut's delivery door was open when Mr. Montgomery's body was discovered and that this alone is insufficient sustain a claim under the malfunction theory. (*Id.* at 15.) Plaintiff responds that the evidence shows (1) the Mastercut's delivery

15

tray initially was high enough for Mr. Montgomery to fit underneath it, (2) the Mastercut was not actively operating when Mr. Montgomery entered it, (3) when his body was found the tray was not at the height it should have been for the delivery door to have opened, and (4) this was not the first time that the delivery door malfunctioned. (ECF 68 at ECF p. 11-13.) Therefore, and relying on Mr. O'Donel's opinion, she argues that a genuine issue of material fact exists as to whether the Mastercut malfunctioned. (*Id.* at ECF p. 13.)

Plaintiff has not produced sufficient evidence to sustain a claim based on her malfunction theory. The Court previously precluded her "from offering Mr. O'Donel's testimony and opinions at trial with respect to an alleged malfunction of the" Mastercut because they were based on his "subjective belief or unsupported speculation." (ECF 133 at 14; ECF 134.) *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). For the same reasons expressed in the Court's prior Memorandum addressing this issue (*see* ECF 133 at 13-17),[9] and absent Mr. O'Donel's corresponding opinion, the record does not

---

[9] No evidence suggests that the delivery door was open before the delivery plate started descending upon Mr. Montgomery. The Mastercut could have paused operating as a result of Mr. Montgomery pressing the quick stop button or executing a controlled stop, *or* it could have paused *as a result of the standby pallet being out of alignment.* (*See* ECF 66-5 at ECF p. 512, 518-19, 867; ECF 66-7 at ECF p. 262, 303.) It is also possible that Mr. Montgomery laid prone underneath the partially loaded delivery plate as he realigned the standby plate, causing the delivery tray to lower and the delivery door to open simultaneously. (*See* ECF 66-5 at ECF p. 751, 757, 856, 867, 972.) Moreover, there is no evidence that the Mastercut previously malfunctioned, and Bobst NA employees tested the Mastercut two days after the incident and found no evidence of a malfunction. (*See* ECF 66-5 at ECF p. 321-22, 457, 551, 583, 630-31, 674, 689, 797, 853-54; ECF 66-7 at ECF p. 4.)

contain sufficient circumstantial evidence from which a reasonable jury could infer that the Mastercut malfunctioned. Likewise, there is no "direct evidence of 'a breakdown in the machine or a competent thereof,'" which is the other method of proving a manufacturing defect strict liability claim. *See Smith v. Howmedica Osteonics Corp.*, 251 F. Supp. 3d 844, 852 (E.D. Pa. 2017) (quoting *Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 224 (Pa. Super. Ct. 1997)).

Accordingly, summary judgment is GRANTED, and Plaintiff is precluded from advancing a strict liability claim based on a manufacturing defect at trial.

### 3.    Whether GPI's Modification of the Panel Was a Reasonably Foreseeable and Substantial Post-Sale Modification.

Bobst NA acknowledges that entry into the Mastercut for maintenance would be necessary at times but argues that GPI allowed its employees to circumvent the proper method of doing so (*i.e.*, lockout/tagout procedures) by removing the panel. (ECF 66-1 at 14.)  According to Bobst NA, it is not liable as a matter of law because this modification was a "substantial change" that Bobst NA could not "have reasonably expected or foreseen." (*Id.* at 13, 16.)  *See Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997).

Plaintiff counters that the panel's modification was foreseeable because it was "affixed with removable screws that Bobst [NA] intended to be removable," and she maintains that all GPI employees had the appropriate type of screwdriver to remove them. (ECF 68 at ECF p. 26-27.) She also argues that Bobst NA's designated representative, Brian Ewart, admitted at his deposition that Bobst NA was aware that

17

customers would remove the panels under the operator platform to access the Mastercut's interior.  (*Id.* at ECF p. 26.)

Although negligence concepts generally play no role in strict products liability actions, Pennsylvania law recognizes that substantial post-sale modification of a product may relieve a manufacturer of liability if the alteration was not reasonably foreseeable.[10] *See Davis*, 690 A.2d at 190; *accord Fisher v. Walsh Parts & Serv. Co.*, 277 F. Supp. 2d 496, 501 (E.D. Pa. 2003). Whether an alteration was foreseeable is measured from the date of the product's sale.  *Fisher*, 277 F. Supp. 2d at 501 (citing *Rooney v. Fed. Press Co.*, 751 F.2d 140, 143 (3d Cir.1984)). Further, whether considered in the context of negligence or strict liability, the modification must have been the superseding cause of the plaintiff's injury. *See id.* (citing *Eck v. Powermatic Houdaille*, 527 A.2d 1012, 1020 (Pa. Super. Ct. 1987); and then citing *Schreffler v. Birdsboro Corp.*, 490 F.2d 1148, 1154 (3d Cir. 1974)). Foreseeability of a substantial change within the meaning of Section 402A ordinarily presents a factual question for the jury. *See id.* at 502 (collecting cases).  Resolution of this issue on summary judgment is not appropriate "unless [the] inferences are so clear that a court can say as a

---

[10] The initial inquiry under this doctrine is whether the Mastercut was substantially altered. *Fisher*, 277 F. Supp. 2d at 501. This is a question of fact that is "removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue," just like the other questions pertinent to Plaintiff's strict liability claim (*i.e.*, whether the Mastercut was defectively designed, whether the panel's modification was foreseeable, and whether any defect or modification proximately caused the injury). *See Shujauddin v. Berger Bldg. Prods., Inc.*, No. 19-876, 2023 WL 2989952, at *6 (E.D. Pa. Apr. 18, 2023) (quoting *Tincher*, 104 A.3d at 335).  On summary judgment neither party disputes that any change to the Mastercut was substantial.  (*See* ECF 66-1 at 15-17; ECF 68 at ECF p. 24-30.)

matter of law that a reasonable manufacturer could not have foreseen the change." *Id.* (quoting *D'Antona v. Hampton Grinding Wheel Co.*, 310 A.2d 307, 310 (Pa. Super. Ct. 1973)). While it is a close call, the record contains sufficient evidence to allow a reasonable jury to conclude that the panel's modification was foreseeable to Bobst NA.

The parties agree that the panel was fastened with Torx screws.[11] (ECF 66-2 ¶ 10; ECF 69 ¶ 10.) This safety feature is classified as a fixed guard. (*See* ECF 66-7 at ECF p. 242-43, 260.)  At some point following the Mastercut's installation, GPI modified the panel by adding handles on its exterior and installing tabs on the frame of the operator platform. (ECF 66-2 ¶ 11; ECF 69 ¶ 11; ECF 66-5 at ECF p. 308, 1015; ECF 66-7 at ECF p. 30-31.) Natalie Mayer, GPI's health, safety, and environment manager, testified that this modification required a safety and hazard analysis as well as approval from several GPI supervisors. (*See* ECF 66-5 at ECF p. 355, 376-77.) She also stated that operating the Mastercut without the panel in place violated GPI's safety policies.  (*Id.* at ECF p. 376.)

Nevertheless, Valer Pavlov, a GPI employee, testified that the panel was "permanently removed" after a September 2021 flood at the GPI facility, likely because there were "too many issues with the empty [pallet] turntable" below the operator platform getting stuck.  (*Id.* at ECF p. 670, 683-84; *see* ECF 66-2 ¶ 19; ECF 69 ¶ 19.)  Joseph Winslow, GPI's lead maintenance mechanic, testified that the maintenance department

---

[11] *See Torx screw*, Collins Dictionary, https://www.collinsdictionary.com/dictionary/english/torx-screw (last visited July 1, 2026) ("A screw having a star-shaped slot into which a Torx screwdriver, a trademarked screwdriver with a star-shaped point, fits." (citation modified)).

added the handles so that "it was easier to lift that guard off when [maintenance personnel] had to get underneath." (ECF 66-5 at ECF p. 612, 621.) He claimed that it was a "common occurrence" for maintenance to need to unjam the turntable used to move the standby pallets into position at the delivery area. (*Id.* at ECF p. 621-22.)

Ms. Mayer testified that it was GPI's policy that only maintenance personnel were to remove the panel following lockout/tagout procedures, not operators. (*Id.* at ECF p. 357.)  According to Ms. Mayer, once maintenance had removed the panel, operators could then go underneath it. (*Id.*) She also testified that only GPI's maintenance team had Torx screwdrivers. (*Id.* at ECF p. 375.) Similarly, at his deposition, Mr. Andrew characterized the Torx screwdriver necessary to remove the Torx screws as a "special tool" that is "typically kept by [a facility's] maintenance department." (*Id.* at ECF p. 186-91; *accord id.* at ECF p. 633 (Mr. Winslow's testimony that a Torx screw is "a special bolt head that you have to use a special tool to open.").) He claimed that the area under the operator platform was "not intended for anyone to access" other than maintenance workers, and only "on an infrequent basis."  (*Id.* at ECF p. 188-90.)

However, Mr. Pavlov, one of GPI's *die cutter operators*, testified that he had gone under the Mastercut's operator platform through the panel (as well as another panel closer to the stairs near the waste removal system) to unjam empty standby pallets. (*See id.* at ECF p. 684-85, 977.)  Additionally, Mr. Winslow stated he believed "everybody ha[d] a [Torx screwdriver] in their toolbox" at the GPI facility, including operators and maintenance personnel.  (*Id.* at ECF p. 632-33.)  Thus, despite GPI's safety policies, there

is at least some evidence that operators cleared jams under the Mastercut's operator platform by entering through the removed panel.

As to whether the modification was reasonably foreseeable, no evidence suggests that Bobst NA was directly aware of the modification. Thomas Roe, Bobst NA's safety manager, merely testified that it was "possible" one of their field technicians had seen it. (*Id.* at ECF p. 436, 447-48.) However, there is evidence that Bobst NA knew GPI employees would need to remove a fixed guard panel to get under the operator platform. Mr. Ewart testified that Bobst NA was "generally aware" that its customers may do so and that he did not "consider [that] in any way a problem." (*Id.* at ECF p. 515.) Michael Cartier, a former safety manager with Bobst NA, testified that doing so was a "common practice" and that removing one of the panels would create an "access point" to the interior side of the delivery area. (*Id.* at ECF p. 566, 579.) Other Bobst NA employees confirmed that users may need to enter the Mastercut's interior at times and that Bobst NA provided *no guidance* as to an appropriate access point. (*Id.* at ECF p. 308-09, 890.)

Besides this deposition testimony, the Mastercut's owner's manual contemplated that die cutter operators would need to access the area below the operator platform. The manual included a "Safety and environment" section addressed to anyone "work[ing] on the machine as an *operator*, preparer, adjuster, [or] mechanic," as well as "anyone responsible for the machine, its production, [and] its maintenance." (ECF 66-7 at ECF p. 40 (emphasis added).) The manual instructed such persons to heed all warnings and pictograms on the Mastercut and stated, "Before carrying out an operation requiring access to the *inside* of the machine, trip the circuit breaker . . . and lock it out with one

21

padlock . . . per technician." (*Id.* at ECF p. 41, 47 (emphasis added).)  The manual also had an "Instructions for *operators* and operator's assistants" section which contemplated that "[s]ome maintenance and repair tasks *require access to be gained to the inside* of the machine." (*Id.* at ECF p. 56-57 (emphasis added).) Further, it instructed *operators* to, *inter alia*, stop the Mastercut, lock its machine controls, and de-energize and lock out the main circuit breaker "before *entering* the machine." (*Id.* (emphasis added).) The manual provided similar instructions for maintenance personnel. (*Id.* at ECF p. 58-59.) It did *not* specify how users should access the Mastercut's interior.  (*See id.* at ECF p. 57-59.)

In addition, the need for waste removal provides another avenue by which Bobst NA could have foreseen a need for regular access to the Mastercut's interior. Its owner's manual instructed users to "*regularly* remove any waste which might adversely affect [its] proper operation." (ECF 66-7 at ECF p. 64 (emphasis added).) Mr. Andrew opined that the incident may have occurred because scrap paper had accumulated under the Mastercut in the area near the standby plate. (*See id.* at ECF p. 291-92; ECF 66-5 at ECF p. 202.) Denis Perret, Bobst NA's field process specialist, testified that such waste is "produced through the normal use" of the Mastercut and that the machine's waste removal system helps to remove it at the stripping station.  (ECF 66-5 at ECF p. 284, 291-92, 296.)  Based on his knowledge of die cutters, Mr. O'Donel testified that "it doesn't take very long" for scrap paper to accumulate.  (*Id.* at ECF p. 803.)  A jury also could conclude that it was foreseeable to Bobst NA that its customers would need to regularly access the area under the operator platform to clear paper waste.

22

Nevertheless, Bobst NA contends that it is not liable as a matter of law because the modification here is comparable to those in *Davis*, 690 A.2d at 190-91, and *Roudabush v. Rondo, Inc.*, No. 15-59, 2017 WL 3912370, at *5-6 (W.D. Pa. Sept. 5, 2017).  (ECF 66-1 at 13-17.)  In *Davis*, the Pennsylvania Supreme Court found that the defendant manufacturers were entitled to judgment as a matter of law where the plaintiff's employer had removed interlocking safety devices on its blenders so that employees could operate more than one blender at a time.  690 A.2d at 190-91.  The Court reasoned that (1) the blender's instruction manual specifically warned against removing the safety device or operating the blender without it and (2) a warning on the blender to "keep fingers out of door openings" adequately warned operators about the danger. *Id.* at 191. The Court in *Roudabush* relied on this same reasoning to grant summary judgment for the defendants on a design defect claim where the plaintiff's employer had removed a safety guard and warnings in the machine's instruction manual and on the machine itself cautioned against using it without the safety guard in place.  *See* 2017 WL 3912370, at *5-6.

Plaintiff counters that the present facts are more akin to those in *Dougherty v. Edward J. Meloney, Inc.*, where the Pennsylvania Superior Court found that it could not conclude as a matter of law that firefighters' misuse of a valve was unforeseeable. 661 A.2d 375, 385-87 (Pa. Super. Ct. 1995).  Distinguishing its prior opinion in *Davis v. Berwind Corp.*, 640 A.2d 1289, 1299-1300 (Pa. Super. Ct. 1994)—the opinion the Pennsylvania Supreme Court affirmed in *Davis*, 690 A.2d at 188—the Superior Court reasoned that there were *no warnings or instructions* not to tamper with the inner workings of the valve and that the misuse "involved taking off an easily-removable covering" rather than a

safety device to duplicate the "function of a device included in the manufacturer's original design." *Dougherty*, 661 A.2d at 386-87.  Specifically, the firefighters had detached a metal cap by "removing two screws." *Id.* at 379.

Plaintiff contends that summary judgment is inappropriate here because the Torx screws on the panel were easily removable using a Torx screwdriver, the Mastercut was able to function as intended without the panel in place, and Bobst NA employees testified the panel was designed and intended to be removable.  (ECF 68 at ECF p. 30.)

While this question is close, Plaintiff has the stronger argument.  A warning label apparently affixed to the *feeder side* of the Mastercut read, "Various guards, safety devices and safe operating procedures are provided [in the owner's manual] and it is your [responsibility] to fully understand them prior to operating this machine." (ECF 66-5 at ECF p. 641; ECF 66-7 at ECF p. 173.)  It also warned users to "not start or operate this machine before checking that all guards and safety devices are in place and functioning properly" or injury could result.  (ECF 66-7 at ECF p. 173.)  However, the owner's manual does not mention the fixed guard plates surrounding the base of the operator platform.[12] Additionally, no warning was on the panel itself, and the warning positioned at the feeder side was not visible from the operator side where the panel was located. (*See* ECF 66-5 at ECF p. 356, 977, 1015.)

---

[12] The owner's manual primarily discusses the movable/interlocked guards on the windows looking into the machine from the operator platform. (ECF 66-7 at ECF p. 51-53, 56-59.) In the section of the manual concerning maintenance, it mentions various guards protecting other parts of the Mastercut, including its optical sensors, braking tablets, power register, and oil reservoirs. (ECF 66-7 at ECF p. 85, 88, 122-24, 148, 151.)

It is uncertain whether a generalized warning label affixed to a different area of the Mastercut is sufficient to place users on notice that the panel should not have been removed during the machine's operation, particularly where the owner's manual did not mention the panel. Accordingly, this matter is more like *Dougherty* than *Davis* or *Roudabush*. While fastening the panel with Torx screws provided somewhat greater security than the "two [standard] screws" at issue in *Dougherty*, 661 A.2d at 379, there is testimony that every GPI operator possessed a Torx screwdriver. This suggests that such tools are not uncommon within the industry and that employees could remove the panel without substantial difficulty. Further, unlike the safety device in *Davis*, 690 A.2d at 188, which was considered an "integral part" of the machine and was "not [to] be removed or modified," Mr. Ewart testified that Bobst NA was aware that (1) Mastercut users periodically removed the fixed guard panels to access the machine's interior and (2) doing so was permissible if a user had followed lockout/tagout procedures. (ECF 66-5 at ECF p. 515.)[13] Bobst NA's failure to warn users specifically not to remove the panel

---

[13] Bobst NA briefly argues that, even if the modification itself was foreseeable, Mr. Montgomery's entry into the Mastercut without following lockout/tagout procedures was not. (*See* ECF 66-1 at 17.) Insofar as this argument focuses on his conduct rather than the foreseeability of the modification itself, that issue is addressed in the discussion of Bobst NA's possible contributory negligence arguments.

If, instead, Bobst NA contends that the modification was not foreseeable because it enabled entry into an energized machine, the argument misses the mark. The employers in *Roudabush* and *Davis* modified machinery to operate it without safety features in direct contravention of manufacturers' warnings and instructions. Here, there is evidence that GPI added handles to the panel only to facilitate access to the machine's interior for maintenance purposes after following lockout/tagout procedures. *See Roudabush*, 2017 WL 39112370, at *5-6; *Davis*, 690 A.2d at 190-91. (*See* ECF 66-5 at ECF p. 616, 621-22.) And Mr. Ewart testified that Bobst NA had no objection to users removing

25

while operating the Mastercut is particularly instructive in this distinction.  Construing the evidence in Plaintiff's favor, a reasonable jury could conclude that the panel's modification was foreseeable.

Ultimately, considering the totality of the evidence, there is a genuine issue of material fact as to whether the panel's modification was reasonably foreseeable to Bobst NA when it sold the Mastercut to GPI.  While Bobst NA argues that the use of Torx screws shows that the panel "was not designed to be routinely removed during operation" (ECF 81 at 5-6), deposition testimony and the Mastercut's owner's manual establish that operators and maintenance personnel would, at least sometimes, need to access the area below the operator platform. Despite Mr. Andrew's claim that Bobst NA believed this access would only be "infrequent" (ECF 66-5 at ECF p. 205), Mr. Pavlov's and Mr. Winslow's testimonies show that the Mastercut often had issues with its turntable.  (*Id.* at ECF p. 621-22, 682-83.)  Any disputes concerning the frequency of these issues or Bobst NA's awareness of the turntable issues are factual matters best left for a jury to determine.

Even supposing that GPI's modification of the panel was not reasonably foreseeable, granting summary judgment would be imprudent because there is a genuine issue of material fact as to whether the modification was a superseding cause of Mr. Montgomery's death.  *See Fisher*, 277 F. Supp. 2d at 502.  Regardless of whether the panel

---

the panel to enter the Mastercut if these procedures were observed. (*Id.* at ECF p. 515.) Thus, the record would permit a reasonable jury to conclude that the modification was reasonably foreseeable to Bobst NA, notwithstanding Mr. Montgomery's possible negligence.

remained in place, there is evidence that the Mastercut's turntable regularly jammed and that GPI's die cutter operators corrected this to resume production. GPI operators also carried Torx screwdrivers.  Therefore, even absent any modification to the panel by GPI, a jury could conclude that Mr. Montgomery would have removed the panel in an effort to clear the jam and, in doing so, perished.

Accordingly, GPI's modification of the panel does not warrant granting summary judgment in Bobst NA's favor as to Plaintiff's design defect strict liability claim.

## B.    Negligence

Bobst NA contends that it is entitled to judgment as a matter of law on Plaintiff's negligence claim[14] because she has failed to prove (1) what duty Bobst NA owed to Mr. Mongomery, (2) that it breached this standard of care, or (3) that any breach was the

---

[14] Count II of Plaintiff's Complaint broadly alleges that Bobst NA was negligent in designing the Mastercut, manufacturing it, and failing to adequately warn its users. (ECF 66-5 at ECF p. 21-23.) These three theories of liability are not entirely distinct, as they all focus on the manufacturer's conduct and require proof of the four standard elements of negligence: duty, breach, causation, and damages. *See Smith*, 251 F. Supp. 3d at 852 (collecting Pennsylvania cases). Nevertheless, the "labels are useful to the extent that they are associated with the various provisions of the Restatement (Second) of Torts that Pennsylvania follows in products liability claims in negligence." *Id.*

As explained above, Plaintiff has abandoned all claims predicated on Bobst NA's alleged failure to warn. Further, for the same reasons that Plaintiff's manufacturing defect strict liability claim cannot proceed, she is precluded from pursuing a negligent manufacturing theory at trial. There is no evidence that the Mastercut was defective under the malfunction theory or that Bobst NA "failed to exercise reasonable care during the 'manufacturing process.'" *Id.* at 853 (citing Restatement (Second) of Torts § 395). Accordingly, the summary judgment analysis for Count II is limited to Plaintiff's negligent design claim consistent with her Response, which focuses exclusively on Bobst NA's alleged failure to design the Mastercut with adequate guarding.  (*See* ECF 68 at ECF p. 33-34.)

factual and proximate cause of Mr. Montgomery's death. (ECF 66-1 at 17-19.) Plaintiff responds that Mr. O'Donel's expert report establishes genuine issues of material fact for each of these elements.  (ECF 68 at ECF p. 33-34.)

Pennsylvania law considers negligence-based products liability theories as distinct from strict liability claims.  *See Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 52 (3d Cir. 2009). Plaintiffs who assert negligence-based claims "must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." *Id.* at 61 (quoting *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003)). Pennsylvania has adopted Section 398 of the Restatement (Second) of Torts for negligent design claims. *Smith*, 251 F. Supp. 3d at 852-53 (citing *Lance v. Wyeth*, 85 A.3d 434, 445 n.13 (Pa. 2014)).  Section 398 provides that "a manufacturer of a chattel made under a design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he *should expect to use the chattel* or to be endangered by its probable use for physical harm caused by his failure *to exercise reasonable care in the adoption of a safe design*."  (Emphasis added) (citation modified).

Whether a duty exists is a question of law. *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010). This inquiry requires the Court to consider "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." *Berrier*, 563 F.3d at 61 (alterations in original) (quoting *Phillips*, 841 A.2d at 1008). Bobst

NA does not dispute that it owed some duty of care to Mr. Montogomery, nor could it. GPI purchased the Mastercut, so Bobst NA should have anticipated that GPI employees would use it in the course of their work. *See Smith*, 251 F. Supp. 3d at 852 n.5 (citing *Tincher*, 104 A.3d at 382) ("The existence of a duty to exercise reasonable care in the manufacturing of a product is implied in the supplier-consumer relationship").

Instead, citing *Rizzo v. Haines*, 555 A.2d 58, 66 (Pa. 1989), Bobst NA argues that Plaintiff has failed to produce the expert testimony needed to establish the applicable standard of care. (ECF 66-1 at 18.) It also maintains she has failed to show that it breached any duty to Mr. Montgomery because the Mastercut was designed in a way that users could safely clear jams and GPI's modification of the panel and Mr. Montgomery's failure to follow lockout/tagout procedures caused his death. (*Id.* at 18-19.) Plaintiff responds that "Mr. O'Donel's report sets forth a manufacturer's responsibility and standard of care, as well as the applicable industry standards of care," for machine guarding and maintains that Bobst NA's design was a violation of these standards. (ECF 68 at ECF p. 34.)

Mr. O'Donel's report suffices to establish genuine issues of material fact as to duty and breach. In the context of a negligence claim brought under Pennsylvania law, industry standards are admissible as evidence of the standard of care where a manufacturer's duty to a plaintiff has been established. *See Morello v. Kenco Toyota Lift*, No. 09-4412, 2015 WL 1400582, at *2 (E.D. Pa. Mar. 26, 2015) (citing *Norton v. Ry. Express Agency, Inc.*, 412 F.2d 112, 114 (3d Cir. 1969)). Mr. O'Donel's report incorporates numerous "industry standards and guidelines" applicable to machine design and guarding that suffice to establish Bobst NA's duty of care. (ECF 66-7 at ECF p. 236-51.)

He also opines at length that Bobst NA violated these industry standards through its failure to implement an alternative design with additional safeguarding. (*Id.*)

In reply, Bobst NA only disputes that Plaintiff has failed to show it breached its duty of care. It argues that it has "set forth evidence that the [Mastercut] met all applicable standards of care" and that none of the standards that Mr. O'Donel cites "refer to interlocking as a higher order of protection than a fixed guard." (ECF 81 at 8 (citing *Davenport v. Medtronic, Inc.*, 302 F. Supp. 2d 419, 435-39 (E.D. Pa. 2004) (finding no genuine issue of material fact where the plaintiff's negligence claim rested on alleged Food and Drug Administration pre-market approval violations and the defendant produced testing showing compliance after the plaintiff had an opportunity for expert testing))). However, Mr. O'Donel opines that the panel should have been designed with interlocked guards instead of fixed guards given the frequent need to remove it to perform maintenance and cites several American National Standard Safety of Machinery ("ANSI") standards in support. (*See* ECF 66-5 at ECF p. 810-11; ECF 66-7 at ECF p. 242-43.) Mr. Andrew's contrary opinion does not quarrel with the applicability of the ANSI standards. He merely claims that the panel did not need to be frequently removed, making fixed guards an appropriate safety measure. (ECF 66-7 at ECF p. 285-86.) The required frequency of access to the Mastercut's interior is a disputed issue, so whether fixed or interlocked guards were appropriate under industry standards is a jury question.

Regarding implementation of (an) additional light curtain(s), Mr. O'Donel cites ANSI standards and professional literature for the proposition that manufacturers have a duty to guard against reasonably foreseeable misuse, including when users clean,

maintain, or unjam products. (ECF 66-5 at ECF p. 243, 248.) He opines that Bobst NA should have foreseen that an operator would enter the Mastercut through the panel to clear a jam or clean up accumulated paper waste, so Bobst NA's failure to adequately guard the pinch point crush hazard with (an) additional light curtain(s) was a breach of the standard of care. (*See* ECF 66-5 at ECF p. 811-13; ECF 66-7 at ECF p. 251-57.) According to Mr. O'Donel, since the use of a fixed guard was inappropriate, the lockout/tagout procedures were insufficient on their own to adequately safeguard the Mastercut because they are administrative controls under ANSI B11.0-2010 (*i.e.*, those that require user input to be effective), which offer a lower order of protection than engineering controls (*e.g.*, barriers, interlocked guards, light curtains, *etc.*). (*Id.* at ECF p. 247-48.)

In response, Mr. Andrew opines that use of an additional light curtain was unnecessary because Bobst NA performed a risk assessment according to EU Machinery directive, ISO12100, and ANSI B11.0-2010 and determined that fixed guards sufficiently safeguarded the machine. (*See id.* at ECF p. 280-81, 298-99.) However, the applicable international standards "allow for the use of fixed guards in situations where access to the hazard is not required." (*Id.* at ECF p. 289) Because the frequency with which GPI employees were required to access the Mastercut's interior is disputed, Bobst NA's use of a fixed guard on the panel does not absolve it of liability as a matter of law. Consequently, there remains a genuine issue of material fact as to whether Bobst NA's failure to use (an) additional light curtain(s) was a breach of the applicable standard of care.

31

Bobst NA makes only conclusory arguments about the causation element of Plaintiff's negligence claim. (*See* ECF 66-1 at 17-19; ECF 81 at 8-9.) Its undeveloped assertions are unworthy of consideration on summary judgment. *See Spokane v. Nationwide Life Ins. Co.*, 617 F. Supp. 3d 290, 306-07 (E.D. Pa. 2022) ("A party must offer some argument or development of its theory, cite relevant precedents, and frame the issues for decision before a court will engage with its advocacy." (citation modified) (quoting *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010)). In any event, Mr. O'Donel's opinions and other record evidence provide support for Plaintiff's contention that Bobst NA's failure to implement an alternative design was the cause-in-fact of Mr. Montgomery's death.  And while the parties may dispute whether GPI's modification of the panel or Mr. Montgomery's conduct breaks the chain of causation, whether the Mastercut's allegedly defective design proximately caused Mr. Montgomery's injuries is a jury question.  *See GTE Corp. v. Allendale Mut. Ins. Co.*, 372 F.3d 598, 608 (3d Cir. 2004) (citing *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1227-29 (3d Cir. 1989)).

At this stage, the evidence is sufficient to create triable issues concerning duty, breach, and causation. Construing the record in Plaintiff's favor, the Court cannot conclude as a matter of law that Bobst NA did not breach its duty to Mr. Montgomery or that its conduct did not proximately cause his injuries.  Accordingly, Bobst NA's motion for summary judgment will be denied as to Count II: Plaintiff's negligence claim.

## IV.    CONCLUSION

For the reasons discussed above, Bobst NA's Motion for Summary Judgment is **GRANTED IN PART** to the extent it seeks to preclude Plaintiff from proceeding on manufacturing defect or failure to warn theories.  In all other respects, Bobst NA's Motion is **DENIED**.

An appropriate Order follows.